[No. D055659. Fourth Dist., Div. One. Feb. 9, 2011.]

CALIFORNIA SCHOOL BOARDS ASSOCIATION et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Appellants.

COUNSEL

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Jonathan K. Renner, Assistant Attorney General, Zackery P. Morazzini and Ross C. Moody, Deputy Attorneys General, for Defendants and Appellants.

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill and Matthew R. Cody for Plaintiffs and Appellants.

OPINION

HALLER, J.—When the Legislature enacts a law requiring a local school district to implement a new program or a higher level of service, the California Constitution requires the State of California (State) to pay the cost of the mandate and prohibits the State from transferring the cost to the school district. During the past decade, the Legislature has enacted numerous statutes requiring school districts to implement many new programs and services.

However, because of budget difficulties, the State has not paid the full cost of these programs and services. Instead, it has sought to satisfy the constitutional requirement by paying a nominal amount for each mandate and deferring the remaining costs to an indefinite time.

In 2007, the California School Boards Association and several school districts (collectively School Districts) brought a lawsuit against the State and two of its officers, challenging this practice of deferring, rather than paying in full, the cost of the state-imposed mandates.[1] The School Districts sought several forms of relief, including (1) declaratory relief that this practice was unconstitutional; (2) injunctive relief prohibiting the State from engaging in this practice in the future; and (3) an order requiring the State to reimburse the School Districts for more than $900 million in unpaid costs incurred in complying with prior mandates. The State countered that its practice was authorized under the California Constitution and implementing statutes, and the court was barred by the separation of powers doctrine and equitable principles from ordering the requested relief.

After reviewing the parties' documentary evidence and conducting a hearing, the trial court found the State's deferral practice violated the California Constitution and several applicable statutes. (See Cal. Const., art. XIII B, § 6; Gov. Code, § 17500 et seq.)[2] The court further found the School Districts were entitled to declaratory and injunctive relief and issued a writ commanding the State in the future to fully fund School District mandated programs (as found by the Commission on State Mandates) or to affirmatively excuse the School Districts from these mandates under section 17581.5. However, the court declined to order the State to reimburse the School Districts for costs previously incurred to comply with prior mandates, concluding this order would violate separation of powers principles. Both sets of parties appeal.

On the State's appeal, we conclude the court properly granted declaratory relief interpreting the applicable constitutional and statutory provisions to mean that the State's payment of a nominal amount for a mandate imposed on a local school district, with an intention to pay the remaining cost at an unspecified time, does not comply with article XIII B, section 6 and the implementing statutes. However, we determine the court erred in ordering

---

[1] The plaintiffs are: California School Boards Association, Education Legal Alliance, San Diego County Office of Education, San Diego Unified School District, Clovis Unified School District, Riverside Unified School District, and San Jose Unified School District. The individual defendants are: Michael Genest, in his capacity as Director of the Department of Finance, and John Chiang in his capacity as State Controller. We refer to defendants collectively as State.

[2] Undesignated statutory references are to the Government Code. All article references are to the California Constitution.

injunctive relief because (1) the ordered relief was inconsistent with the statutory scheme; (2) the writ required the performance of a discretionary, rather than a ministerial, duty; and (3) equitable relief was unwarranted because the School Districts have an adequate legal remedy for future violations under section 17612, subdivision (c).

With respect to the School Districts' cross-appeal, we determine the court did not abuse its discretion in refusing to order the State to pay the almost $1 billion in previously deferred costs or to permit the School Districts to conduct further discovery on the reimbursement issue.

## SUMMARY OF LAW GOVERNING SCHOOL DISTRICT STATE MANDATES

Before 1978, local governments received a substantial portion of their financing through property taxes. In 1978, the voters adopted Proposition 13, adding article XIII A to the California Constitution, which imposed strict limits on the government's power to impose property taxes. The next year, the voters adopted Proposition 4, adding article XIII B, which imposed corresponding limits on governmental power to spend for public purposes. (See *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 80–81 [61 Cal.Rptr.2d 134, 931 P.2d 312]; *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 905 [58 Cal.Rptr.3d 762].)

One key component of article XIII B's spending limitations is contained in section 6, which states: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service . . . ." (Art. XIII B, § 6, subd. (a).) The intent underlying this section was to "preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose. [Citations.]" *(County of San Diego v. State of California, supra,* 15 Cal.4th at p. 81.)

■ In 1984, the Legislature enacted a comprehensive statutory and administrative scheme for implementing article XIII B, section 6. (§ 17500 et seq.; *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331–333 [285 Cal.Rptr. 66, 814 P.2d 1308]; *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 588 [79 Cal.Rptr.3d 489] *(County of San Diego).)* In so doing, the Legislature created the Commission on State Mandates (Commission) to resolve questions as to whether a statute imposes "state-mandated costs on a local agency within the meaning of section 6."

(*County of San Diego v. State of California, supra*, 15 Cal.4th at p. 81; see §§ 17525, 17533 et seq.) Under this regulatory scheme, when the Legislature enacts a statute imposing obligations on a local agency or a school district without providing additional funding, the local entity may file a test claim with the Commission, which, after a public hearing, must determine whether the statute requires a new program or increased level of service. (*County of San Diego v. State of California, supra*, 15 Cal.4th at p. 81; §§ 17551, 17555.) If the Commission determines the statute meets this criterion, the Commission must determine the cost of the mandated program or service and then notify specified legislative entities and executive officers of this decision. (§§ 17557, 17555.) A local agency or school district may challenge the Commission's findings by administrative mandate proceedings. (§ 17559; Code Civ. Proc., § 1094.5.)

■ Once this administrative/judicial process is exhausted and a statute is determined to impose state-mandated costs, the Legislature is required to appropriate funds to reimburse the local entity for these costs. (§§ 17561, subd. (a), 17612, subd. (a).) "If the Legislature refuses to appropriate money for [the] reimbursable mandate, the local agency [or school district] may file 'an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement' " under section 17612, subdivision (c). (*County of San Diego v. State of California, supra*, 15 Cal.4th at p. 82.)

■ Section 17612, subdivision (c) (formerly subd. (b)) initially provided the exclusive method for a local entity to seek relief from an unfunded mandate. However, in 1990, the Legislature added section 17581, which provides an alternative to the judicial proceeding under section 17612. It provides that a local agency is relieved of the obligation to implement an unfunded mandate if the Legislature specifically identifies the mandate and declines to fund it in the annual budget act. (§ 17581, subd. (a); see *Tri-County Special Educ. Local Plan Area v. County of Tuolumne* (2004) 123 Cal.App.4th 563, 571–572 [19 Cal.Rptr.3d 884] (*Tri-County*).) The Legislature later added section 17581.5, which creates similar (but more limited) relief for certain unfunded mandates imposed on school districts.

Section 17552 declares that these statutory provisions "provide the sole and exclusive procedure by which a local agency or school district may claim reimbursement for costs mandated by the state as required by Section 6 of Article XIII B . . . ."

### FACTUAL AND PROCEDURAL BACKGROUND

In November 2007, the School Districts filed a lawsuit in San Diego County Superior Court alleging the State has refused to comply with its

obligation to provide reimbursement under article XIII B, section 6 for costs "mandated by the State" after the Commission has determined the existence and costs of the mandates. The State filed an answer denying these claims. The court set a briefing schedule and a hearing date in May 2008.

In their moving papers, the School Districts presented evidence showing that since 2002, the Legislature has engaged in a routine practice of appropriating $1,000 for each mandate imposed on the School Districts, rather than appropriating the full amount of the program costs. Specifically, for the 2007–2008 fiscal year, the Commission found 38 separate programs or services require reimbursement as unfunded mandates under article XIII B, section 6. In each case, the State did not appeal or the appeal was decided adversely to the State. The State then appropriated $1,000 for each of the 38 programs. These mandates included items such as annual parent notification, pupil health screening, criminal background checks, AIDS prevention instruction, immunization records, teacher incentive program, and pupil promotion and retention. The School Districts presented evidence that as compared with this $38,000 appropriated funding, the total statewide cost estimates for the programs in the 2007–2008 fiscal year exceeded $160 million. Further, the $1,000 appropriation per program equates to about $1 for each California school district for the entire fiscal year.

The School Districts also presented evidence showing the State refers to this funding method as "deferred" mandate payments or an "Education Credit Card," which the Legislative Analyst's Office states "means that [full] funding will be provided at some unspecified future time." Although the State acknowledges it does not provide full funding for state-mandated programs on an annual basis, the State maintains the deferral practice complies with article XIII B, section 6, and thus the School Districts are "required to perform the mandated activities." A Legislative Analyst's Office report states that the "credit card [method] represents a way the state has maintained [mandated] program[s] while cutting expenditures during slow economic times," and "represents amounts the state owes to K-14 education for costs that were not fully funded during the fiscal year in which services were provided."

The evidence showed the total amount of unpaid school mandate funding was estimated to reach $435 million (without interest) by the end of the 2007–2008 fiscal year. For example, the accumulated deficiency for the "Standardized Testing and Reporting" mandate was more than $200 million. The approximate amount of costs for incurred unreimbursed programs and services include $30 million for the San Diego Unified School District; $14 million for the Clovis Unified School District; and $12 million for the San Jose Unified School District. The Governor's proposed budget for the

2008–2009 fiscal year continued the deferral practice, allocating only $1,000 for each of 38 mandates instead of the estimated $180 million required to fund these mandates.

The School Districts argued the deferred funding method violates article XIII B, section 6, and the implementing statutory scheme. They requested the court issue a writ (1) ordering the State to comply with its statutory obligations to identify each mandate in the annual budget bill "and to either appropriate funds to cover the costs of [the] mandate or to suspend the obligation to provide the mandated service or program"; (2) ordering the State to reimburse the School Districts for all costs previously incurred in providing state-mandated programs and services from existing state accounts; and (3) declaring certain mandate statutes unconstitutional to the extent they do not require the State to pay the full cost of the State's mandated programs and services or impose an undue restriction on the enforcement of the constitutional right to reimbursement.

In opposition, the State acknowledged the existence of its deferral practice, but argued the $1,000 funding was proper because neither the California Constitution nor the applicable statutes require the mandates be paid "immediately," particularly because the State has agreed to pay interest on any delayed payments. According to the State, "[school] districts that have performed under the mandates are guaranteed to receive payment for properly submitted claims." The State additionally argued that writ relief was not appropriate because the allegations do not show the State has failed to perform a ministerial duty and the School Districts have a statutory remedy in section 17612, subdivision (c). The State also argued the separation of powers doctrine prohibited the court from entering a judgment against the State for mandate amounts owed from previous years.

After briefing and the submission of evidence was completed, this court filed its decision in *County of San Diego, supra,* 164 Cal.App.4th 580, in which we reversed a superior court judgment requiring the State to appropriate funds over a 15-year period to pay San Diego and Orange Counties for amounts owed for their previously incurred mandate costs. (*Id.* at pp. 592, 593–597.) We held the court's order compelling the appropriation violated the separation of powers doctrine, and the order was unnecessary because the Legislature had enacted a specific statute pertaining to outstanding mandate debt owed to counties. (*Id.* at pp. 594, 595–596.) We additionally held the court did not abuse its discretion in refusing to order the State to pay this debt from existing fund accounts. (*Id.* at pp. 597–603.)

The trial court then permitted the parties to file supplemental briefs on the impact of *County of San Diego* on the issues before the court. After the

additional briefing and a hearing, the trial court issued a written decision, finding the State's practice of deferring payment to the School Districts violated the language and intent of article XIII B, section 6, and the statutory scheme enacted to implement the constitutional provision. The trial court found the evidence showed "virtually all" school districts had suffered "adverse effects" from the State's failure to timely provide mandate funding, and quoted from a 2006–2007 Governor's Budget Analysis showing the State estimated it owes the school districts " 'approximately $1.2 billion for unpaid mandate costs through 2005–2006.' "

The trial court additionally concluded the legal remedy contained in section 17612, subdivision (c) was not available to the School Districts to challenge the nominal funding practice because this statutory remedy applies only if the Legislature completely "deletes" the mandate funding from the Budget Act. The court found that by providing a nominal amount for each mandate, "the Legislature has effectively circumvented [the School Districts] from exercising their statutory remedy" under section 17612, subdivision (c), and thus the School Districts "have no adequate available legal remedy but for this writ of mandate."

However, relying on *County of San Diego, supra*, 164 Cal.App.4th 580, the trial court refused to order the State to pay amounts owed to the School Districts for prior mandates. As detailed below, the court found it was barred by the separation of powers doctrine from issuing this order, and that the exception for ordering payment from existing funds was inapplicable. The court also denied the School Districts' request to conduct further discovery on this issue.

The court then issued a lengthy judgment and a writ of mandate. With respect to the ordered declaratory relief, paragraph 7 of the judgment reads: "The Court finds that an actual controversy exists between petitioners and respondents as to the nature of the requirement imposed upon the State by article XIII B, section 6 of the California Constitution and the statutory scheme set forth at Gov. Code §§ 17500 et seq. that makes declaratory relief under Code of Civil Procedure § 1060 appropriate. The Court hereby finds and declares that the State's failure to include the full costs of all mandates as determined by the [Commission] in the Budget Act, and its practice of appropriating $1,000 and deferring the balance of the costs of those mandates, constitutes a failure to provide a subvention of funds for the mandates as required by article XIIIB, section 6 and violates the constitutional rights conferred by that provision and the specific procedures set forth at Gov. Code §§ 17500 et seq."

The writ of mandate states in relevant part: "[T]he [State and its officers] *are commanded to*: [¶] 1. Ensure that the costs of each mandate determined to

be reimbursable by the Commission on State Mandates, including interest, shall be included in the Governor's proposed budget as required by Government Code sections 17500 et seq. and in particular sections 17561 and 17612 unless specifically identified and suspended pursuant to Government Code [section] 17581.5. [¶] 2. [The State and its officers] are enjoined from appropriating an amount for any mandate to [the School Districts] less than the amount determined to be reimbursable by the Commission on State Mandates. Said [parties] shall not defer any balance of any mandated program and shall include the full amount determined to be reimbursable in the Governor's proposed budget unless suspended pursuant to Government Code section 17581.5." (Italics added.) The court ordered the State to file a return in the superior court certifying its compliance with the writ.

Both sets of parties appeal.

## DISCUSSION

### I. *Deferred Mandate Payment Is Not Equivalent to a Funded Mandate*

Before addressing the parties' specific contentions raised on appeal and cross-appeal, it is necessary to resolve the fundamental legal dispute underlying each of the parties' contentions: whether the State complies with its constitutional and statutory obligations to fund a mandate imposed on the School Districts by appropriating a nominal ($1,000) amount for the mandated program, with the intention to pay the remainder with interest at an unspecified time. As explained below, we agree with the trial court's determination that a deferred appropriation is not a funded mandate within the meaning of article XIII B, section 6, and the implementing statutory provisions.

■ Article XIII B, section 6 provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government [(defined to include school districts)], the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service [(with exceptions not applicable here)] . . . ." (Art. XIII B, § 6, subd. (a).) Subvention means " 'a grant of financial aid or assistance, or a subsidy.' " (*County of San Diego, supra*, 164 Cal.App.4th at p. 588, fn. 4.)

■ This reimbursement obligation was "enshrined in the Constitution . . . to provide local entities with the assurance that state mandates would not place additional burdens on their increasingly limited revenue resources." (*Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 836, fn. 6

[244 Cal.Rptr. 677, 750 P.2d 318]; see *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1282 [101 Cal.Rptr.2d 784].) "Section 6 recognizes that articles XIII A and XIII B severely restrict the taxing and spending powers of local governments. [Citation.] Its purpose is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, *which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose.* [Citations.] With certain exceptions, section 6 '[e]ssentially' requires the state 'to pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies. [Citation.]' " (*County of San Diego v. State of California, supra,* 15 Cal.4th at p. 81; accord, *County of Los Angeles v. Commission on State Mandates* (2003) 110 Cal.App.4th 1176, 1188–1189 [2 Cal.Rptr.3d 419]; *County of Sonoma v. Commission on State Mandates, supra,* 84 Cal.App.4th at p. 1282; *Redevelopment Agency v. Commission on State Mandates* (1997) 55 Cal.App.4th 976, 985 [64 Cal.Rptr.2d 270].)

The implementing statutes are consistent with this intent. Section 17561 is the primary code section that sets forth the State's duties once a mandate is determined by the Commission. Section 17561, subdivision (a) states: "The state *shall* reimburse each local agency and school district for *all* 'costs mandated by the state,' as defined in Section 17514[3] and for legislatively determined mandates in accordance with Section 17573.[4]" (Italics added.) Section 17561, subdivision (b)(1)(A) states: "For the initial fiscal year during which these costs are incurred . . . [¶] . . . [a]ny statute mandating these costs *shall* provide an appropriation therefor." (Italics added.) Section 17561, subdivision (b)(2) states: "In subsequent fiscal years appropriations for these costs *shall* be included in the annual Governor's Budget and in the accompanying Budget Bill. . . ." (Italics added.) Section 17561, subdivision (c) provides: "The amount appropriated to reimburse local agencies and school districts for costs mandated by the state *shall* be appropriated to the Controller for disbursement." (Italics added.)

In this case, the Commission found 38 separate school district programs or services require reimbursement as unfunded mandates under article XIII B, section 6, and in each case, the State did not appeal or the appeal was decided adversely to the State. Many of these programs were found to cost more than

---

[3] Section 17514 defines " '[c]osts mandated by the state' " to "mean[] any increased costs which a local agency or school district is required to incur after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, or any [specified] executive order . . . , which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution."

[4] Section 17573 provides for a legislative settlement process as an alternative to the more lengthy Commission process for mandate determinations.

$1 million. However, instead of appropriating the full amount determined by the Commission to be the total cost of each program, the State appropriated $1,000 for each program, approximately $1 per school district for each mandated program.

 This practice violates the language and intent of the constitutional and statutory provisions. By attempting to pay for the new programs with a "credit card" with no fixed date for full payment, the State is shifting the actual costs of these mandates to the local school districts. The fact that the State takes the position (without any specific legislation to this effect) that it intends to pay the full cost with interest does not eliminate the cost burden. Unless it is excused from implementing the program, each school district will have a *current* cost for the program or increased level of service. Under article XIII B, section 6, if the State wants to require the local school districts to provide new programs or services, it is free to do so, but not by requiring the local entities to use their own revenues to pay for the programs.

The State concedes the intent underlying the constitutional and statutory provisions was to prevent cost shifting to the local governments, but argues that payment at some later, undefined time is consistent with this intent, as long as interest is eventually paid to the School Districts. However, this argument is inconsistent with the fundamental purpose of article XIII B, section 6, which was to require each branch of government to live within its means, and to prohibit the entity having superior authority (the State) from circumventing this restriction by forcing local agencies such as the School Districts to bear the State's costs, even for a limited time period. By imposing on local school districts the financial obligation to provide state-mandated programs on an indeterminate and open-ended basis, the State is requiring school districts to use their own revenues to fund programs or services imposed by the State. Under this deferral practice, the State has exercised its authority to order many new programs and services, but has declined to pay for them until some indefinite time in the future. This essentially is a compelled loan and directly contradicts the language and the intent of article XIII B, section 6, and the implementing statutes.

We reject the State's arguments in support of a contrary conclusion.

First, the State notes that article XIII B, section 6, as originally enacted, did not contain an express temporal requirement for mandate payments, but in 2004 voters (through Prop. 1A) adopted amendments requiring appropriations in "the full payable amount."[5] These amendments expressly applied

---

[5] Under the amendments, beginning in the 2005–2006 fiscal year, the Legislature must generally appropriate the "full" amount of the mandate or suspend the operation of the mandate for the fiscal year. (Art. XIII B, § 6, subd. (b)(1).) The amendment further provided

only to "a city, county, city and county, or special district," and not to school districts. (Art. XIII B, § 6, subd. (b)(4).) The State claims that Proposition 1A was placed on the ballot as a result of a political compromise between local governments and the State arising from local government budget difficulties caused by the State's practice of deferring mandate payments to these entities. The State thus contends the "very fact that cities and counties had to go to the ballot and obtain specific limits on the timing of payments for mandates confirms that section 6 had no temporal requirement at all prior to Proposition 1A." The State further asserts that if the School Districts want the same benefits, they will need to negotiate a similar political compromise with the State.

These arguments are unpersuasive. There is nothing in the language of Proposition 1A, or in the ballot materials presented to the voters, showing the State did not already have the obligation to fully fund the mandates when they were imposed. The Proposition 1A compromise added several new features to the local-state mandate relationship, including a specific constitutional provision making clear that the deferral practice (with respect to cities and counties) would no longer be tolerated and adding a requirement that the Legislature provide a specific time period for the State to reimburse these local entities for the prior mandate debt. (Art. XIII B, § 6, subd. (b)(1), (2).) This compromise does not mean the deferral practice was authorized under the prior law, and did not involve any type of concession that the practice was previously legally authorized.

■ Moreover, even assuming there was an indication that the parties to the compromise, or the voters in adopting Proposition 1A, believed the prior law allowed the State to defer payments, this belief is not binding on a court. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922–923 [44 Cal.Rptr.3d 223, 135 P.3d 637].) A court should not accept later expressed legislative intent if the intent is inconsistent with the plain meaning of the prior act or its legislative history. (*Id.* at p. 922.) The interpretation of a statute or a constitutional provision " 'is an exercise of the judicial power the Constitution assigns to the courts.' [Citation.]" (*Ibid.*; see *Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1348 [95 Cal.Rptr.2d 28].)

■ The State also contends the court erred in determining the deferral method was improper because the constitutional and statutory provisions do not specifically "say that the reimbursement must be made in full in a single payment, or within one year." However, the fact that a "payment in full"

---

that for a mandate incurred prior to the 2004–2005 fiscal year, the amounts "may be paid over a term of years, as prescribed by law." (Art. XIII B, § 6, subd. (b)(2).) This "prescribed by law" term for repayment of amounts owed to the cities and counties is now a 15-year period, as set forth in section 17617.

phrase was not used does not mean the Legislature intended to permit a deferral of funds. As discussed, article XIII B, section 6's language and underlying intent impose the timeliness requirement for the reimbursement obligation without the need to use these precise words. Likewise, section 17561, subdivision (a)'s statement that "all" costs must be reimbursed by the State is a clear statutory directive requiring full payment once a mandate is determined by the Commission (and any appeals process has been completed). An interpretation of section 17561 that would allow partial payments would render the word "all" superfluous.

■ The State next contends that section 17561, subdivision (d)(2)(C), which allows the State Controller to adjust the mandate payments to correct for any prior underpayments, "expressly contemplates that the initial payment may not be payment in full."[6] However, section 17561, subdivision (d)(2)(C) pertains to the controller's audit function, allowing the controller to correct inaccurate fund disbursements after auditing the local entity's supporting records. This administrative power to adjust payments is not equivalent to stating that the Legislature has the authority to provide a nominal payment for a mandate.

■ The State also relies on the controller's statutory authority to issue "prorated" payments. Section 17567 states that the controller must "prorate claims" if "the amount appropriated for reimbursement purposes pursuant to Section 17561 is not sufficient to pay all of the claims approved by the Controller . . . ." This code section does not provide the Legislature with the legal authority to provide insufficient funding for mandates. To the contrary, section 17567 specifically states that "[i]n the event that the Controller finds it necessary to prorate claims as provided by this section, the Controller shall *immediately* report this action to [specified executive and legislative entities and officers] *in order to assure appropriation of these funds in the Budget Act.*" (§ 17567, italics added.)

■ We similarly reject the State's reliance on section 17561.5, which provides that an initial reimbursement claim "shall include accrued interest . . . if the payment is being made more than 365 days after adoption of the statewide cost estimate for an initial claim. . . ." This required interest payment does not provide the Legislature with the authority to implement a policy under which it pays only a nominal amount of a mandated claim. Rather it provides for interest payments where the actual costs are more than those estimated as costs during the Commission process.

We also find unconvincing the State's discussion of the fact that in the 2006–2007 fiscal year it made payments on the outstanding mandate debt and

---

[6] Section 17561, subdivision (d)(2)(C) states: "The Controller shall adjust the payment to correct for any underpayments or overpayments that occurred in previous fiscal years."

that these "payments demonstrate that the Constitutional right to reimbursement is being honored through the practice of deferred payments." As the Legislative Analyst's Office noted, the State repaid *some* outstanding claims while at the same time deferring more claims in the subsequent year. A single reimbursement payment does not show the mandates are being timely funded.

■ We thus conclude the Legislature's practice of nominal funding of state mandates with the intention to pay the mandate in full with interest at an unspecified time does not constitute a funded mandate under the applicable constitutional and statutory provisions.

## II. *Parties' Appellate Challenges to Judgment and Writ*

Having determined the deferral practice is improper, we now consider the parties' specific appellate challenges to the trial court's determinations regarding the relief requested by the School Districts.

### A. *Court's Grant of Declaratory Relief*

■ "Declaratory relief is an equitable remedy, which is available to an interested person in a case 'of actual controversy relating to the legal rights and duties of the respective parties . . . .' (Code Civ. Proc., § 1060 . . . .)" (*In re Claudia E.* (2008) 163 Cal.App.4th 627, 633 [77 Cal.Rptr.3d 722], fn. omitted.) " 'The purpose of a declaratory judgment is to "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation." ' [Citation.] 'Another purpose is to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation [citation].' [Citation.] The proper interpretation of a statute is a particularly appropriate subject for judicial resolution. [Citation.] Additionally, judicial economy strongly supports the use of declaratory relief to avoid duplicative actions to challenge an agency's statutory interpretation or alleged policies. [Citations.] [¶] The remedy of declarative relief is cumulative and does not restrict any other remedy. . . ." (*Ibid.*) Thus, the fact that "another remedy is available is an insufficient ground for refusing declaratory relief." (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 433 [121 Cal.Rptr.2d 844, 49 P.3d 194].) Moreover, declaratory relief is generally available to settle the parties' rights with respect to future actions, and not to correct conduct that occurred in the past.

In paragraph 7 of the judgment, the court declared that the State's practice of paying only a nominal amount for a mandated program while deferring the balance of the cost "constitutes a failure to provide a subvention of funds for the mandates as required by article XIIIB, section 6 and violates the constitutional rights conferred by that provision and the specific procedures

set forth at [section] 17500 et seq." This form of declaratory relief was proper, as there was an actual controversy between the parties regarding the interpretation of article XIII B, section 6 and section 17561, pertaining to the use of deferred mandate payments. The declaration will prevent further issues arising from the conflicting interpretations, and was an effective remedy to settle the parties' rights in the future regarding the meaning of the provisions. The State has not challenged these conclusions.

Although on appeal the State focuses primarily (if not exclusively) on challenging the injunctive relief ordered by the court, it indirectly challenges the portion of the judgment granting declaratory relief based on the State's assertions that a deferred mandate is a funded mandate that must be implemented by the School Districts. For the reasons explained above, we have rejected this argument. The State does not proffer any other basis for finding the court's granting declaratory relief (as set forth in par. 7 of the judgment) was improper. We thus affirm the portion of the judgment providing this declaratory relief.

### B. *Court's Grant of Injunctive Relief*

#### 1. *Overview*

In the writ of mandate, the court "commanded" the State and its officers to engage in several affirmative tasks relating to the budget process and prohibited these defendants from deferring any mandates unless it "identified and suspended" the mandate under section 17581.5. Specifically, the court ordered the State to "[e]nsure that the costs of each mandate determined to be reimbursable by the Commission . . . *shall* be included in the Governor's proposed budget as required by . . . sections 17561 and 17612 *unless specifically identified and suspended pursuant to [section] 17581.5.*" (Italics added.) The court additionally "enjoined" the State "from appropriating an amount for any mandate to [the School Districts] less than the amount determined to be reimbursable by the Commission" and stated the State "shall not defer any balance of any mandated program and shall include the full amount determined to be reimbursable in the Governor's proposed budget *unless suspended pursuant to [section] 17581.5.*" (Italics added.)

The State contends the court had no authority to order these forms of mandamus relief because (1) the School Districts have an adequate remedy at law; (2) the court's order concerned discretionary, rather than ministerial, duties; and (3) the court's actions violate separation of powers principles. We agree with these arguments. Given the specific statutory procedures for addressing an unfunded mandate, the court erred in issuing the writ because the School Districts have an adequate remedy at law; the writ improperly

restricts the State's discretionary authority; and the writ improperly interferes with budgetary powers committed exclusively to the legislative and executive branches.

To explain these conclusions, we first detail the existing statutory remedies applicable when the Legislature has failed or refused to fund an administratively determined state mandate. We then describe the basis for our legal determinations that the writ was an unauthorized use of the court's mandamus powers.

### 2. *Statutory Remedies for Failure to Fund Determined Mandates*

Under the statutory scheme, the Commission must promptly notify specified legislative and executive bodies of its determination on a test claim (§ 17555), and must submit a biannual report to the Legislature identifying the mandates found and the cost of the mandates (§ 17600). "Upon receipt of the report submitted by the [C]ommission . . . , funding *shall* be provided in the subsequent Budget Act for costs incurred in prior years." (§ 17612, subd. (a), italics added.) If the Legislature does not comply with this duty, the statutes provide two potential remedial procedures. (§§ 17612, subd. (a), 17581, 17581.5.) These remedies are directed at excusing a local school district from performing the mandate, rather than affirmatively compelling the Legislature to appropriate funds for the mandate.

First, under section 17581.5, the Legislature can avoid paying the mandate costs if it identifies the statutory program in the budget act as a mandate for which no funding is provided in that fiscal year and specifically relieves the school district of the requirement that it implement the program.[7] (See also § 17581 [similar remedy applicable to local agencies].) With respect to school districts, this action is permitted only pertaining to certain categories of mandates. (§ 17581.5, subd. (c).) If this procedure is properly invoked with respect to a statutory mandate, the remedy is self-executing in the sense that it does not require any affirmative action by the school district, i.e., if the Legislature makes this specific "nonfunding" designation, each school district

---

[7] Section 17581.5, subdivision (a) provides: "A school district . . . shall not be required to implement or give effect to the statutes, or a portion of the statutes . . . during any fiscal year and for the period immediately following that fiscal year for which the Budget Act has not been enacted . . . if all of the following apply: [¶] (1) The statute . . . has been determined by the Legislature, the commission, or any court to mandate a new program or higher level of service requiring reimbursement of school districts . . . pursuant to Section 6 of Article XIII B . . . . [¶] (2) The statute . . . specifically has been identified by the Legislature in the Budget Act for the fiscal year as being one for which reimbursement is not provided for that fiscal year. . . ."

is "permitted to make its own determination not to implement the mandate." (*Tri-County, supra*, 123 Cal.App.4th at p. 572 [interpreting § 17581].)

Second, if the Legislature does not fund a determined mandate and does not specifically designate the mandate as one for which no funding will be provided under section 17581 or 17851.5, the local agency or school district *must* perform the mandate, unless it *affirmatively obtains relief under section 17612, subdivision (c)*. (See *Tri-County, supra*, 123 Cal.App.4th at pp. 573–574.) Section 17612, subdivision (c) states: "If the Legislature deletes from the annual Budget Act funding for a mandate, the local agency or school district may file in the Superior Court of the County of Sacramento an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement for that fiscal year."

Unlike the remedy in sections 17581 and 17581.5, the remedy under section 17612, subdivision (c) is not self-executing and requires the local entity to affirmatively seek judicial relief to be excused from the mandate. (*Tri-County, supra*, 123 Cal.App.4th at p. 573; see *Kinlaw v. State of California, supra*, 54 Cal.3d at p. 333; *Berkeley Unified School Dist. v. State of California* (1995) 33 Cal.App.4th 350, 358–359 [39 Cal.Rptr.2d 326].) This remedy affords relief prospectively, and not as to funds previously paid out by a local agency to satisfy a state mandate. (See *Lucia Mar Unified School Dist. v. Honig, supra*, 44 Cal.3d at p. 833, fn. 3.)

Thus, "[a] Commission determination that a cost results from an unfunded state mandate does not necessarily mean the Legislature will pay for it. If the Legislature does not pay [or excuse the school district under section 17581.5], with a favorable Commission determination in hand, an entity may seek a court order [under section 17612, subdivision (c)] that it no longer has to obey the mandate . . . ." (*Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 877 [86 Cal.Rptr.3d 890] (*Grossmont Union*).) "The intent of the Legislature . . . could not be more clear: until and unless a court or the Legislature itself has relieved a local government of a statutory mandate, the local government must perform the duties imposed by the mandate [even if the mandate is not funded]." (*Tri-County, supra*, 123 Cal.App.4th at p. 573.) In establishing this procedure by which local governments may seek relief from an unfunded program, "the Legislature has ensured an orderly procedure for resolving these issues, eschewing the local government anarchy that would result from recognizing a county's ability sua sponte to declare itself relieved of the statutory mandate." (*Ibid.*)

### 3. *Writ Was Improper Because the School Districts Have an Adequate Remedy at Law*

To warrant relief in the form of a writ of mandate requiring a party to take (or not to take) certain actions in the future, the petitioner must demonstrate there is no adequate legal remedy. (See *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752 [85 Cal.Rptr.2d 512].) We determine the School Districts had an adequate remedy at law under section 17612, subdivision (c) for any future attempts by the State to defer mandate payments.

The trial court found the School Districts did not have an adequate legal remedy with respect to future nominally funded mandates because section 17612, subdivision (c) applies only when the Legislature completely removes a particular mandate from a budget bill, and this judicial procedure cannot be used if the Legislature provides some (although nominal) funding. Based on this interpretation, the trial court found the State had essentially created a "Catch-22" situation for the School Districts—they could not refuse to comply with the mandate and they could not seek to be relieved of the obligation to implement the mandate under the established statutory procedures.

On appeal, the State argues the court's statutory interpretation was erroneous. The State asserts that if the Legislature provides only nominal funding for a reimbursable mandate, the School Districts are "free to seek a declaration of that fact under section 17612, subdivision (c) and receive a judicial declaration that it need not comply with that mandate for a year." In support, the State cites to our recent *County of San Diego* decision in which we stated in footnote 28 that although "the Counties are denied the judicial remedy they seek in this case, it is important to note that the statutory scheme implementing article XIII B, section 6, does not leave local agencies remediless for the Legislature's failure to fund state mandates. . . . When the Legislature provides only nominal funding for a mandate, as was the case with many of the mandates at issue here, the local agency's remedy is to file an action under section 17612, subdivision (c), to declare the mandate unenforceable and to enjoin its enforcement for that fiscal year." (*County of San Diego, supra,* 164 Cal.App.4th at p. 613, fn. 28.)

In response, the School Districts argue that these statements were "*dicta*" and urge this court to reach a different conclusion in this case. However, they do not present any evidence that a school district (or any other entity) has ever been precluded from obtaining section 17612, subdivision (c) relief from

a deferred and nominally funded mandate. They also acknowledge there are no reported decisions holding that such relief is unavailable.[8]

█ After reexamining the statutory language, we adhere to our prior interpretation of this statute. Section 17612, subdivision (c) states: *"If* the Legislature *deletes* from the annual Budget Act funding for a mandate, the local agency or school district may file in the Superior Court of the County of Sacramento an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement for that fiscal year." (Italics added.) In interpreting this code section, " 'our primary task is to determine the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] In determining legislative intent, we look first to the statutory language itself. [Citation.]' " (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 423 [104 Cal.Rptr.3d 590].) " ' "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." [Citation.]' " (*Ibid.*; see *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 923 [104 Cal.Rptr.3d 673].) **(20)** Moreover, a court must presume the Legislature acts consistently with the Constitution when enacting legislation, and we must adopt an interpretation that upholds the statute's constitutionality if the interpretation is consistent with the statutory language and purpose. (See *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1145 [89 Cal.Rptr.2d 745].)

█ Under these principles, the proper interpretation of section 17612, subdivision (c) is that a party is permitted to seek relief for nominal funding as well as a complete lack of funding for a determined state mandate. Although section 17612, subdivision (c) contains the word "deletes," when viewed in context, this term does not refer to the physical act of entirely deleting an item from a budget bill, but refers more generally to the deletion of all or part of the administratively determined cost from the amount required to be appropriated to the local entity. After the adoption of article XIII B, the Legislature enacted comprehensive procedures for resolution of claims arising out of article XIII B, section 6. "The Legislature did so because the absence of a uniform procedure had resulted in inconsistent

---

[8] They cite only to language in *Berkeley Unified School Dist. v. State of California, supra,* 33 Cal.App.4th at page 360, in which the court observed that the Legislature's deletion of funding from a claims bill triggers the statutory period for filing an action under section 17612, subdivision (c). Because the *Berkeley Unified* court was not addressing the issue presented here, we find the court's observations to be unhelpful to our analysis.

rulings on the existence of state mandates, unnecessary litigation, reimbursement delays, and, apparently, resultant uncertainties in accommodating reimbursement requirements in the budgetary process." (*Kinlaw v. State of California, supra,* 54 Cal.3d at p. 331.) As part of this legislative scheme, the Legislature created an administrative process for resolving issues regarding the existence and costs of mandates, *and* a judicial process for obtaining relief from unfunded mandates. This judicial process involved a method for local entities to challenge unfunded mandates (after a determination by the Commission) by filing an action seeking a declaration in Sacramento County Superior Court that the entity was excused from implementing the mandate. The essence of this new procedure was to consolidate all such actions in one venue and place the burden on local entities to seek judicial relief if the State failed to abide by its obligations to fund a particular mandate.

It would be inconsistent with this judicial remedy and the state Constitution to interpret section 17612, subdivision (c) as providing a right to seek relief only if there is "no" funding for a mandate, as opposed to nominal funding. As noted, the $1,000 funding required the School Districts to use their own funds to provide programs mandated by the State. This is virtually the same harm as providing no funding for a particular program, and is directly contrary to the constitutional mandate contained in article XIII B, section 6. If we were to interpret the remedial provision in section 17612, subdivision (c) as limited to legislative decisions to provide zero funding, we would be concluding that the statutory scheme does not provide a remedy for a school district to avoid an unfunded mandate. This result could not have been contemplated by the drafters of the statutory scheme, who were seeking to effectuate (and not defeat) the voters' intent underlying the constitutional provision.

We thus reaffirm our conclusion in *County of San Diego* that where an appropriation is the functional equivalent of deleting funding, a local entity (including a school district) has a right to seek a declaration of that fact under section 17612, subdivision (c) and receive a judicial declaration that it need not comply with the mandate for one year.[9] Because the School Districts have this legal remedy, it was improper for the court to issue an injunction controlling the State's future actions in these matters.

---

[9] In the proceedings below, the School Districts argued the requirement that an entity bring an action *every year* to seek relief under section 17612, subdivision (c) for an unfunded mandate was an unreasonable restriction on its constitutional rights under article XIII B, section 6. The court rejected this facial challenge, but stated its ruling was without prejudice to petitioners bringing an "as-applied" challenge to the annual requirement. The School Districts did not cross-appeal from this portion of the order. Thus, the issue is not before us on this appeal. Although they mention the issue in passing in a footnote of their appellate brief, this footnote was insufficient to present the issue on appeal.

In reaching this conclusion, we recognize that the State's prior position that it was permitted to require the School Districts to implement the state-mandated programs despite the nominal funding appears inconsistent with the State's current interpretation of section 17612, subdivision (c) that the School Districts have a right to seek a court order declaring the mandate to be unenforceable. However, this inconsistency has now been resolved. We have affirmed the trial court's grant of declaratory relief that the State violates article XIII B, section 6 and the implementing statutes by requiring a school district to implement a program under a deferred payment practice. And we have held (consistent with the State's current position) that if the State violates these provisions in the future, the School Districts will have a right to obtain relief from a required implementation of the program under section 17612, subdivision (c).[10]

### 4. Writ Interferes with Discretionary Functions and Separation of Powers Doctrine

We additionally conclude the writ was improperly issued because it compels a discretionary, not a ministerial, act.

■ To obtain writ relief, the petitioner must show the respondent has "a clear, present, and ministerial duty to act in a particular way." (*County of San Diego, supra*, 164 Cal.App.4th at p. 593.) "A ministerial duty is one that is required to be performed in a prescribed manner under the mandate of legal authority without the exercise of discretion or judgment." (*Ibid.*) Thus, a writ of mandate should not compel action by the Legislature unless " 'the duty to do the thing asked for is plain and *unmixed with discretionary power or the exercise of judgment.*' " (*Id.* at p. 596.) On its face, the issued writ interferes directly with the Legislature's discretionary functions by requiring the Legislature to appropriate funds for certain local school district programs and services. The determination as to how and whether to spend public funds is within the Legislature's broad discretion.

The School Districts argue that the writ implicates only ministerial powers because it does not "tell[] the Legislature which programs it must retain or forego, nor does it order the Legislature to fund any program" and instead

---

[10] We note the State would be precluded from arguing that the School Districts waived claims for *prior* unpaid mandates by previously failing to seek relief under section 17612, subdivision (c). The State's prior agreement to pay for these costs, and its prior position that these mandates were required, is inconsistent with a claim that the School Districts previously waived their right to reimbursement for those costs by not invoking the statutory remedy. However, in the future, if the School Districts wish to be relieved of an obligation when there is only nominal funding, they will be required to seek relief under section 17612, subdivision (c) in the Sacramento County Superior Court.

merely compels the State to comply with existing law and to make the choice given to it by the existing statutory scheme.

■■■ However, the writ expressly orders the Legislature to include School District mandate items in the annual budget bill, and then to fully fund each mandate *or* to "suspend" the mandate pursuant to section 17581.5. This choice is not mandated by the statutes or the Constitution. Under the statutory scheme, the Legislature has the discretion to choose not to fund a mandate. If this occurs, the Legislature may specifically identify the program in a budget act and suspend the requirement for one year. (§ 17581.5; see fn. 7, *ante*.) But the Legislature is not required to provide this relief. If the Legislature does not do so, it is then a school district's obligation to seek affirmative relief in the Sacramento County Superior Court to excuse compliance with the mandate for one year. (§ 17612, subd. (c); see *Tri-County, supra*, 123 Cal.App.4th at p. 572.) This process is consistent with article XIII B, section 6, which prohibits the State from requiring local entities to perform unfunded state mandates, but does not compel the State to provide funding if it does not wish to require a particular program.

In issuing the writ, the court disregarded this fundamental structure of the judicial mandate relief procedures, and specifically ordered the Legislature to perform one of two acts: fully fund a mandate or affirmatively excuse compliance under section 17581.5. Because the Legislature has the statutory discretion to make other choices (not fund and require the local entity to seek affirmative relief from the mandate), the court's order pertained to a discretionary duty and thus was beyond the court's mandamus authority.

The School Districts alternatively argue that we should, at a minimum, uphold the portion of the writ requiring the Legislature to place the cost of a determined mandate in the annual budget bill because this is expressly required by the statutes. (See § 17561, subd. (b).) The School Districts claim the identification of the mandates and their costs is essentially a ministerial task designed to provide public notice and information about mandate determinations made by the Commission.

■■■ This argument is unavailing. There is nothing ministerial about placing items in a budget bill. The formulation of a budget bill, including the items to be placed in the bill, is inherently a discretionary and a legislative power. (See *In re Madera Irrigation District* (1891) 92 Cal. 296, 310 [28 P. 272].) The budget determination "is limited by [the Legislature's] own discretion, and beyond the interference of courts." (*Ibid.*; see *City of Sacramento v. California State Legislature* (1986) 187 Cal.App.3d 393, 398 [231 Cal.Rptr. 686].)

For similar reasons, we conclude the writ also violates California's separation of powers doctrine. A court has no authority to issue a writ of mandate that interferes with powers exclusively committed to the other branches of government. (*County of San Diego, supra,* 164 Cal.App.4th at pp. 593–594.) The enactment of a budget bill is fundamentally a legislative act, entrusted to the Legislature and the Governor and not the judiciary. (See *Grossmont Union, supra,* 169 Cal.App.4th at p. 886; *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1214 [70 Cal.Rptr.2d 745].) The California Constitution's separation of powers doctrine forbids the judiciary from issuing writs that direct the Legislature to take specific action, including to appropriate funds and pass legislation. (*County of San Diego, supra,* 164 Cal.App.4th at pp. 593–594; see *City of Sacramento v. California State Legislature, supra,* 187 Cal.App.3d at pp. 396–398.)

Under these principles, a court is prohibited from using its writ power to require an appropriation even if the Legislature is statutorily required to appropriate certain funds. (See *City of Sacramento v. California State Legislature, supra,* 187 Cal.App.3d at pp. 397–398.) The "matter is . . . one in which political power to accomplish that end is vested in the Legislature. 'Under our form of government the judicial department has no power to revise even the most arbitrary and unfair action of the legislative department, or of either house thereof, taken in pursuance of the power committed exclusively to that department by the constitution.' " (*Id.* at p. 398.) Limitations on the use of judicial writ authority to control legislative action is a core purpose of the separation of powers doctrine.

### C. *Cross-appeal: Court's Refusal to Order Relief for Past Unpaid Mandate Debt*

In addition to seeking an order directing the State to prospectively take certain actions, the School Districts also sought an order requiring the State to pay more than $900 million in unpaid mandate debt (including interest) for programs and services previously provided and unreimbursed by the State. The court declined to order this relief, noting the "magnitude of the funds" and the "separation of powers" principles embodied in the California Constitution. The court relied on our recent decision in *County of San Diego, supra,* 164 Cal.App.4th 580, in which we upheld the trial court's discretion to deny monetary relief for prior mandate debt on similar grounds.

On appeal, the School Districts contend the trial court erred in reaching its conclusions without permitting them to conduct discovery on the availability of funding sources for the unpaid debt. We conclude the court acted within its discretion.

1. *Factual and Procedural Background*

In their complaint, the School Districts requested that the court enter an order compelling the State to reimburse them for $900 million in "outstanding unreimbursed costs from generally related State accounts which have been appropriated and are otherwise available for payment of the State's obligation . . . ." This request was based on a line of cases in which the courts have recognized a narrow exception to the rule that a court has no power to compel the Legislature to appropriate funds. (See *Butt v. State of California* (1992) 4 Cal.4th 668, 697–703 [15 Cal.Rptr.2d 480, 842 P.2d 1240] *(Butt)*; *Mandel v. Myers* (1981) 29 Cal.3d 531, 539–545 [174 Cal.Rptr. 841, 629 P.2d 935]; *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155, 181 [275 Cal.Rptr. 449].) As explained in more detail below, this exception applies when funds have already been appropriated and the existing funds are related to the subject matter of the unpaid debt.

However, in their moving papers, the School Districts identified only one potential funding source for the payment of the outstanding $900 million debt: the "Proposition 98 reversion fund." (See Ed. Code, § 41207.5.) The School Districts argued that because the Legislature had previously used this account to reimburse districts for deferred mandates, it would be available to pay for some or all of the outstanding mandate debt. The State responded that the Proposition 98 reversion account does not contain funds available for this purpose, and would conflict with specific state law funding requirements.

This court then filed *County of San Diego*, in which we upheld the trial court's discretion to deny the counties' claims for reimbursement of mandate costs owed from prior budget years. (*County of San Diego, supra*, 164 Cal.App.4th at pp. 597–603.) In supplemental briefing, the School Districts requested the court to bifurcate the matter and provide them an opportunity to conduct discovery and present evidence on the issue of the availability of existing State funds to pay the outstanding mandate debt. The State opposed this request, noting the request was untimely and that the nature and magnitude of the relief sought were inconsistent with the judiciary's role in the budgetary process and could only lead to "chaos" in the state budget.

After a hearing, the court declined to order affirmative relief on the prior debt claim, stating: "[T]he magnitude of the funds previously deferred and owed to [the School Districts], coupled with the separation of powers clause set forth in article III, section 3 . . . and the appropriation powers afforded to the Legislature under article IV, section 10 and 12, and article XVI, section 7 . . . preclude the Court from ordering the Legislature to reimburse petitioners from undesignated existing appropriations . . . ." The court also

denied the School Districts' request to conduct discovery "[i]n light of the Court's conclusion that [the requested] relief is precluded as a matter of law . . . ."

The School Districts appeal from this ruling.

## 2. *Analysis*

■ Under the California Constitution, the separation of powers doctrine prohibits a court from compelling the Legislature " 'to appropriate funds or to pay funds not yet appropriated.' " (*County of San Diego, supra,* 164 Cal.App.4th at p. 598.) A narrow exception to this rule exists " 'when a court orders appropriate expenditures from already existing funds' " and the funds " 'are "reasonably available for the expenditures in question," ' " which means that " 'the purposes for which those funds were appropriated are "generally related to the nature of costs incurred. . . ." [Citation.]' " (*Ibid.*; see *Butt, supra,* 4 Cal.4th at pp. 698–703.)

This exception must be strictly construed and is inapplicable if the existing funds have been appropriated for other purposes. (*Butt, supra,* 4 Cal.4th at pp. 698–703; see *County of San Diego, supra,* 164 Cal.App.4th at pp. 598–599.) Moreover, a trial court has broad discretion to determine whether a mandamus remedy requiring a particular payment from an existing fund is warranted under the totality of the circumstances. " " " '[C]ases may . . . arise where the applicant for relief has an undoubted legal right, for which *mandamus* is the appropriate remedy, but where the court may, in the exercise of a wise discretion, still refuse the relief.' " ' " (*County of San Diego, supra,* at p. 599.)

In *County of San Diego,* the parties stipulated that the State owed San Diego County $41 million and Orange County $72 million for prior unfunded mandates, and the counties asked the court to order this debt to be repaid from budgets of more than 20 state agencies. (*County of San Diego, supra,* 164 Cal.App.4th at pp. 599–600, 606.) During a bench trial, the parties called numerous witnesses from the various state agencies on the issue of the existence of funds to pay for the costs of the State's prior mandate debt. (*Id.* at p. 591.) After trial, the court found the counties had not met their burden to show the availability of the funds sought or the required relationship between many of the mandates and the funds sought. (*Ibid.*)

We concluded the evidence supported the trial court's factual findings. (See *County of San Diego, supra,* 164 Cal.App.4th at pp. 597–603.) We additionally held the court's conclusion was proper even if there was a relationship with respect to some available funds and the unpaid mandates. (*Ibid.*) We

explained that under "the unique circumstances surrounding the Counties' petition for writ of mandate in this case, . . . the court acted well within the bounds of judicial discretion in denying the relief the Counties sought." (*Id.* at p. 599.) We reasoned that "the existence of a *clear, present,* ministerial duty to fully pay the Counties' subject reimbursement claims from the state budget of the single fiscal year in question was negated by the enormity of the relief the Counties sought. Given the magnitude of the Counties' reimbursement claims, the large number of mandates at issue, the large number of agencies from which the Counties sought reimbursement, and, most important, the insufficiency of the Counties' evidence to show that the purposes of the subject mandates were generally related to the various appropriations from which the Counties sought reimbursement, or that the targeted funds were reasonably available, the court acted well within its discretion in denying the Counties' request for a writ of mandate compelling prompt payment of their reimbursement claims from the state's 2005–2006 fiscal year budget." (*Id.* at p. 603.)

We reach a similar conclusion in this case. The School Districts were seeking almost $1 billion in funds from the State, but cited only a single account ("the Proposition 98 reversion fund") that could possibly contain funds to meet the "reasonably related" test. However, the School Districts did not present any specific evidence regarding the availability of funds in this account to satisfy the State's debt. Although the School Districts sought to conduct additional discovery to support their claim, they did not come forward with any predicate facts showing a reasonable basis to believe sufficient funds exist and that the funds would meet the criteria of the exception (a relationship between available funds and the subject matter of the debt). (See *Butt, supra,* 4 Cal.4th at pp. 698–702.) Because appropriations for the budget year at issue were placed in a bill following the Governor's signature on the budget act, this evidence was available without a discovery order. In seeking to make this showing, the School Districts asserted only that the Legislature had used funds in the Proposition 98 reversion fund in the past. This claimed fact is insufficient to show that funds currently exist to pay the mandate debt.

Moreover, we decline the School Districts' invitation to construe our prior *County of San Diego* holding as limited only to its unique facts or to reconsider our holding. In *County of San Diego,* we affirmed a trial court's broad discretion to refuse to compel repayment of millions of dollars from a state budget where the magnitude of the reimbursement sought, as well as the large number of specific outstanding mandates and the potential funds from which such mandates would be paid, would place the court in a situation where it was essentially acting in a budgetary and legislative, rather than a

judicial, role. (See *County of San Diego, supra*, 164 Cal.App.4th at pp. 602–603.) This same principle supports the court's refusal to apply the exception in this case.

Further, the court did not abuse its discretion in declining to permit petitioners to engage in a wide-ranging discovery investigation in an attempt to identify funds to pay prior mandate costs. Currently our state is experiencing an extreme budget crisis with a budget deficit estimated to be more than $20 billion. Any money a court would direct to the School Districts would reduce funds available for other obligations and implicate funding priorities and policymaking decisions. These decisions are for the Legislature. Under the particular circumstances of the case, an order requiring the State to pay its claimed $900 million mandate debt from existing funds would improperly "elevate the judiciary above its coequal brethren, upset the delicate system of checks and balances, and stand the separation of powers clause on its head." (*Butt, supra*, 4 Cal.4th at p. 703.)

### III. *Request for Judicial Notice*

The School Districts request that we take judicial notice of five sets of documents, identified as exhibits A through E. Exhibits A, B, and C contain recently enacted statutes, which apparently reflect additional deferred mandates. Exhibits D and E are reports by the Legislative Analyst's Office prepared in February 2010 and April 2010, after the judgment was entered in this case. None of these exhibits were presented to the trial court.

■■■ We deny this request. Generally, " 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; accord, *In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1209 [51 Cal.Rptr.3d 172].) It is a fundamental principle of appellate law that our review of the trial court's decision must be based on the evidence before the court at the time it rendered its decision. (See *Vons Companies, Inc. v. Seabest Foods, Inc., supra*, 14 Cal.4th at p. 444, fn. 3; *Kumar v. National Medical Enterprises, Inc.* (1990) 218 Cal.App.3d 1050, 1057, fn. 1 [267 Cal.Rptr. 452].) The School Districts have not cited any exceptional circumstances that would justify a deviation from this rule in this appeal.

Moreover, the proffered materials would not affect our analysis in this case. The fact the State has continued the practice of mandate deferral is already part of the record on appeal. Further, the opinions expressed by the Legislative Analyst's Office after the judgment was entered are not relevant to our legal determinations.

## DISPOSITION

We reverse the judgment insofar as it grants injunctive relief in favor of the School Districts, and affirm the judgment in all other respects. We remand for the court to vacate the writ of mandate and to issue a new judgment consistent with the determinations in this opinion. Each party to bear its own costs.

Benke, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied March 8, 2011, and the petitions of plaintiffs and appellants for review by the Supreme Court were denied May 18, 2011, S191613.