Filed 2/7/18 (unmodified opn. attached)

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **CALIFORNIA SCHOOL BOARDS ASSOCIATION et al.,**<br><br>　　**Plaintiffs and Appellants,**<br><br>**v.**<br><br>**STATE OF CALIFORNIA et al.,**<br><br>　　**Defendants and Respondents.** | **A148606**<br><br>**(Alameda County<br>Super. Ct. No. RG11554698**)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellants' January 31, 2018 petition for rehearing is denied. It is ordered that the opinion filed on January 16, 2018, be modified as follows.

On page 17, the last sentence of the second full paragraph, is amended to state:

But even if a school district's " 'proceeds of taxes' " include subventions received from the state, we are not persuaded the reference to "state funding" in Education Code section 42238.24 includes local tax revenues.

The modification effects no change in the judgment.

Dated: February 7, 2018　　　　　　　_____ P. J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts III and IV.

1

California School Boards Association, et al. v. State of California, et al. (A148606)

Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Evelio Grillo

Counsel:

Olson Hagel & Fishburn, Deborah B. Caplan and Richard C. Miadich, for Plaintiffs and Appellants California School Boards Association and its Education Legal Alliance.

Xavier Becerra, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Constance L. LeLouis, Supervising Deputy Attorney General and Seth E. Goldstein, Deputy Attorney General, for Defendants and Respondents State of California, State Controller John Chiang, and Director of the Department of Finance Michael Cohen.

Camille Shelton, Chief Legal Counsel, for Defendant and Respondent Commission on State Mandates.

A148606

Filed 1/16/18 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **CALIFORNIA SCHOOL BOARDS ASSOCIATION et al.,** | |
| **Plaintiffs and Appellants,** | **A148606** |
| **v.** | |
| **STATE OF CALIFORNIA et al.,** | **(Alameda County Super. Ct. No. RG11554698)** |
| **Defendants and Respondents.** | |

We consider the vexing problem of how California, particularly its legislative branch, may comply with the requirement that it fund its education mandates, imposed by the California Constitution, article XIII B, section 6. Is it constitutional for the state legislature to designate funding it already provides to school districts as offsetting revenue when reimbursing them for the costs of new state-mandated programs? In this case, where the legislation operates prospectively only, the answer is yes.

The appellants in this case are the California School Boards Association and its Education Legal Alliance (CSBA), the San Diego Unified School District, the Butte County Office of Education, the San Joaquin County Office of Education, and the Castro Valley Unified School District (the School Districts). Respondents are the State of

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts III and IV.

1

California, the California State Controller, the Director of the California Department of Finance (collectively, the State), and the Commission on State Mandates.[1]

CSBA and the School Districts appeal the trial court's denial of their motion for a writ of mandate as to the second cause of action in their third amended petition, its denial of their motion for leave to file a fourth amended petition, and its dismissal of the remaining causes of action in the third amended petition. CSBA and the School Districts request that we "reverse the trial court and declare Government Code section 17557(d)(2)(B) unconstitutional to the extent it allows the State to avoid mandate reimbursement by identifying 'offsetting revenues' that simply represent funding already apportioned to school districts for other purposes as provided in Education Code sections 42238.24 and 56523."

We affirm in part and reverse in part. In the published portion of our opinion, we affirm the trial court's denial of the motion for a writ of mandate as to the second cause of action in the third amended petition. We hold Government Code section 17557, subdivision (d)(2)(B), as applied in Education Code sections 42238.24 and 56523, subdivision (f), does not violate the state's constitutional obligation to reimburse local governments for the costs of mandated programs, and it does not violate the separation of powers doctrine. In the unpublished portion, we reverse the trial court's denial of the motion for leave to amend, and its subsequent dismissal of the remaining causes of action.

FACTUAL AND PROCEDURAL BACKGROUND

We begin with an overview of the constitutional and statutory provisions regarding reimbursement for the costs of mandates, the specific education mandates at issue in this case, and how amendments to Government Code and Education Code provisions are alleged to affect them.

---

[1] For the most part, the Commission on State Mandates does not take a position on the merits of the claims by CSBA and the School Districts.

A. The State's Constitutional Obligation to Reimburse Local Governments for the Costs of Mandated Programs

In 1978, the voters adopted Proposition 13, adding article XIII A to the California Constitution, which imposed strict limits on the government's power to impose taxes. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 80–81 (*County of San Diego*).) The next year, the voters added article XIII B, which imposed corresponding limits on governmental power to spend for public purposes. (*Id.* at p. 81.) One component of article XIII B's spending limitation is contained in section 6, which states: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service . . . ." (Cal. Const., art. XIII B, § 6, subd. (a).) The intent was to "preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego*, *supra*, 15 Cal.4th at p. 81.) School districts are "local governments" protected by section 6. (Cal. Const., art. XIII B, § 8.)

In 1984, the Legislature enacted a comprehensive statutory and administrative scheme to implement and govern the reimbursement process. (Gov. Code, § 17500 et seq.)[2] The Legislature created the Commission on State Mandates (the Commission), a quasi-judicial body with the authority to decide whether a "local agency or school district is entitled to be reimbursed by the state for costs mandated by the state as required by Section 6 of article XIII B of the California Constitution." (§§ 17525, 17551.) When the Legislature enacts a statute or executive order imposing obligations on a local government without providing additional funding, the local entity may file a "test claim" with the Commission, which, after a public hearing, must determine whether the statute

---

[2] Unless noted, all further statutory references are to the Government Code.

3

or executive order requires a new program or increased level of service. (*County of San Diego*, *supra,* 15 Cal.4th at p. 81; §§ 17551, 17555.)

"The state shall reimburse each local agency and school district for all 'costs mandated by the state.' " (§ 17561, subd. (a).) If the Commission determines a statute or executive order imposes state-mandated costs, it must "adopt parameters and guidelines for reimbursement of any claims relating to the statute or executive order." (§ 17557, subd. (a).) In adopting parameters and guidelines, the Commission "may adopt a reasonable reimbursement methodology." (§ 17557, subd. (b).)

The Commission submits the adopted parameters and guidelines to the State Controller's Office, which issues claiming instructions. (§ 17558.) The Controller can initiate an audit or field review of a reimbursement claim for actual costs and may adjust the claim. (§ 17558.5, subds. (a)–(c).) If the Controller reduces a claim, the claimant may appeal the reduction to the Commission. (§§ 17558.6, 17558.7, 17558.8.) If dissatisfied with the Commission's decision, "[a] claimant or the state may commence a proceeding in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure to set aside a decision . . . on the ground . . . [it] is not supported by substantial evidence." (§ 17559, subd. (b).)

If a mandate is "specifically identified by the Legislature in the Budget Act for the fiscal year as being one for which reimbursement is not provided for that fiscal year," then local agencies are not required to implement or give effect to it. (§ 17581, subd. (a).) "If the Legislature deletes from the annual Budget Act funding for a mandate, the local agency or school district may file in the Superior Court of the County of Sacramento an action in declaratory relief to declare the mandate unenforceable and enjoin its enforcement for that fiscal year." (§ 17612, subd. (c); *California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 798 (*CSBA II*).)

B.     The Graduation Requirements Mandate (the GR Mandate)

In 1983, the Legislature amended the Education Code to include a requirement that no student can graduate from high school without completing two science courses. (Ed. Code, § 51225.3, subd. (a)(1)(C); Stats. 1983, ch. 498, § 94, pp. 2124–2125.)

4

Before the amendment, only one science course was required. In 1987, the Commission determined this additional science class requirement imposed "a reimbursable state mandate upon school districts." (Commission on State Mandates, Decision No. CSM-4181, Jan. 22, 1987.)[3] In 1988, the Commission adopted parameters and guidelines for reimbursement of the GR Mandate, determining reimbursable costs included costs of acquiring additional space, remodeling existing spaces, and "staffing and supplying the new science classes." (*San Diego Unified School District, et al. v. Commission on State Mandates, et al.* (Super. Ct. Sacramento County, Dec. 27, 2004, No. 03CS01401), p. 4 (*San Diego USD*).)

Following this determination, there were years of amendments to the parameters and guidelines and related litigation.[4] In 1991, the Commission amended the parameters and guidelines to require school districts to document that acquired spaces were in fact required "for new science classes, not to meet increased high school student enrollment, and that it would have been infeasible or more expensive to remodel existing facilities." (*San Diego USD, supra,* at p. 6.) In 2004, the Sacramento County Superior Court rejected the Commission's 2000 determination that savings attained by laying off teachers for non-mandated courses should be taken into account in determining reimbursements for the costs of staffing the additional science class. (*Id.* at pp. 17–18.)

---

[3] Some, but not all, of the Commission's decisions included in the parties' Joint Appendix are available on the Commission's website, https://www.csm.ca.gov/decisions.php#schooldistrict.

[4] It is not clear if CSBA and the School Districts contend school districts and county offices of education are entitled to reimbursement for costs of the GR Mandate dating back to 1984, or from some later date. In the third amended petition, CSBA and the School Districts refer to "the State's chronic refusal to pay since 2002." In their opening brief, they refer to the GR Mandate as "a debt unpaid since 1987," but also indicate that "[s]ome payments have been made since that time."

5

In 2008, the Commission further amended the parameters and guidelines covering reimbursement claims for the GR Mandate.[5]  In response to a Department of Finance (DOF) argument that the proposed reasonable reimbursement methodology for teacher salary costs should be denied because it did not consider "revenue limit apportionments" provided to school districts, the Commission determined "revenue limit apportionments . . . are the districts' 'proceeds of taxes' and cannot be considered offsetting revenue under article XIII B, section 6 of the California Constitution."  (Commission on State Mandates, Revised Final Staff Analysis (Hearing Date: Nov. 6, 2008), pp. 1–2)

In 2013, the Sacramento County Superior Court denied the DOF's petition for a writ of mandate challenging aspects of the 2008 amendments to the parameters and guidelines for reimbursement of the GR Mandate.  (*Department of Finance v. Commission on State Mandates* (Super. Ct. Sacramento County, Mar. 20, 2013, No. 34-2010-80000529), Minute Order, p. 7.)  The court noted the DOF's petition alleged the reasonable reimbursement methodology for the GR Mandate was invalid "because it does not provide for an offset of revenue limit apportionment funding received by school districts . . . .  DOF's opening and reply memoranda contain no argument or authorities to support this claim . . . .  The Court therefore deems this claim to have been abandoned, and makes no ruling on it here."  (*Id.* at pp. 7–8, fn. 10.)

C.     The Behavioral Intervention Plans (BIP) Mandate

In 1990, legislation was enacted requiring the Superintendent of Public Instruction and the State Board of Education to adopt regulations establishing "behavioral intervention" plans, or BIPs, for special education students.  (Ed. Code, § 56523, Stats. 1990, ch. 959, § 1, pp. 4040–4041.)  In 1993, the Department of Education adopted

---

[5]     In their Joint Appendix, the parties include a document entitled, "Revised Final Staff Analysis" when discussing the Commission's 2008 amendments to the parameters and guidelines for reimbursement of the GR Mandate.  Because the parties cite to this document when discussing the 2008 amendments, and because they do not indicate otherwise, we presume this 62-page document reflects the Commission's adopted amendments.

implementing regulations. (Cal. Code Regs., tit. 5, §§ 3001, 3052.) According to the Commission, BIPs involved "the design, implementation, and evaluation of instructional and environmental modifications to produce significant improvements in behavior through skill acquisition and the reduction of problematic behavior." (Commission on State Mandates, Decision No. CSM-4464, adopted Sept. 28, 2000, p. 3, fn. omitted.) In 2000, the Commission determined that aspects of the implementing regulations for BIPs imposed a reimbursable state-mandated program. (*Id.* at p. 18.) The period of reimbursement began on July 1, 1993. (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, p. 1.)

In 2008, after years of litigation regarding the BIP Mandate, a settlement was reached calling for "all retroactive and current reimbursement claims to be extinguished by an allocation of $510 million to school districts for the cost of the BIPs activities, $10 million to [special education local plan areas] and county offices of education, and $65 million annually to school districts for ongoing costs of the program." (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, p. 4.) However, the Legislature did not fund the settlement, and, according to the Commission, the BIP Mandate "has not been reimbursed to date." (*Ibid.*)

In 2013, the Commission adopted parameters and guidelines and reasonable reimbursement methodologies pertaining to the BIP Mandate, covering matters including the costs of training. (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, pp. 1–8, 63.) In 2013, the Legislature repealed the regulations that were the basis of the BIP Mandate. (Ed. Code, § 56523, subd. (a); Stats. 2013, ch. 48, § 44, p. 1410.) Hence, according to CSBA and the School Districts, "the offsetting revenue issue for this mandate . . . extends only through 2012–2013."

D.      Senate Bill No. 856 and Assembly Bill No. 1610

In 2010, the Legislature enacted Senate Bill No. 856, which, among other changes, amended section 17557 of the Government Code. (Sen. Bill No. 856 (2009–2010 Reg. Sess.) § 32.) Subdivision (d)(2)(B) now provides that the State can request to amend parameters or guidelines to "[u]pdate offsetting revenues and offsetting savings that

7

apply to the mandated program and do not require a new legal finding that there are no costs mandated by the state pursuant to subdivision (e) of Section 17556." (§ 17557, subd. (d)(2)(B).)

In 2010, the Legislature also enacted Assembly Bill No. 1610, which, among other changes, added or amended two sections of the Education Code. (Assem. Bill. No. 1610 (2009–2010 Reg. Sess.) § 16.) The bill added section 42238.24, which provides in part that "[c]osts related to the salaries and benefits of teachers incurred by a school district or county office of education to provide the courses . . . [required by the GR Mandate] shall be offset by the amount of state funding apportioned to the district . . . or . . . county office of education . . . . The proportion of the school district's current expense of education that is required to be expended for payment of the salaries of classroom teachers . . . shall first be allocated to fund the teacher salary costs incurred to provide the courses required by the state." (Ed. Code, § 42238.24.) In 2011, the DOF filed a request with the Commission to amend the parameters and guidelines for the GR Mandate to identify Education Code section 42238.24 as a required offset. (DOF letter available online at https://csm.ca.gov/matters/11-PGA-03/doc2.pdf. [as of Jan. 12, 2018].) According to the parties, the DOF's request has been stayed pending the outcome of this litigation.

The assembly bill also amended section 56523 of the Education Code. (Assem. Bill. No. 1610 (2009–2010 Reg. Sess.) § 27.) Subdivision (f) provides "[c]ommencing with the 2010–11 fiscal year, if any activities authorized pursuant to this chapter and implementing regulations are found to be a state reimbursable mandate pursuant to Section 6 of Article XIII B of the California Constitution, state funding provided for purposes of special education . . . [in] the annual Budget Act shall first be used to directly offset any mandated costs." (Ed. Code, § 56523, subd. (f).)[6]

_____

[6]     The third amended petition refers to subdivision (e) of section 56523. As a result of 2013 amendments to the statute, it was re-lettered to subdivision (f). (Assem. Bill No. 86 (2013–2014 Reg. Sess.), ch. 48, § 44, p. 1411.) The amendments changed the

8

In its 2013 statement of decision adopting parameters and guidelines for reimbursement of the BIP Mandate, the Commission responded to the 2010 legislative changes by holding that state funding for special education in the annual budgets since 1993 was "potentially offsetting . . . and must be deducted from a reimbursement claim to the extent a district applied these funds to provide for BIPs mandated activities." (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, p. 50.) The Commission further held that Education Code section 56523, subdivision (f) "transform[s] potential offsets to required offsets, beginning in fiscal year 2010–2011." (*Id.* at p. 55.)

E.      State Funding for Education and the Block Grant System

State funding for education includes, or has included, revenue limit funding, categorical funding, local control funding formula (LCFF) money, and education protection account funds. Revenue limit funding was part of "a strict system of equalized funding (Ed. Code, § 42238 et seq.), under which . . . 'the amount of property tax revenues a district can raise, with other specific local revenues, [was] coupled with an equalization payment by the state, thus bringing each district into a rough [per student] equivalency of revenues.' " (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1186, fn. 10, 1194.)

Revenue limit funding was replaced by LCFF beginning in 2013–2014. (Ed. Code, §§ 42238.02, 42238.03; Stats. 2013, ch. 47, §§ 28, 30, pp. 1301, 1308.) According to the School Districts, the LCFF uses a school district's "prior revenue limit and categorical funding as the base and adds additional funding for high concentrations of English learners and economically disadvantaged students." Education protection account funding derives from a temporary tax increase imposed on retailers in 2013. (Cal. Const., art. XIII, § 36, subds. (e), (f).) In addition, "Proposition 98, adopted by the

word "section" to "chapter," but did not otherwise alter the text of the subdivision. (*Ibid.*) Even though CSBA and the School Districts refer generally in their opening brief to section 56523, we construe their constitutional challenge as limited to subdivision (f) of this section because this subdivision is the only one discussed in their briefing.

voters in 1988, . . . provide[s] a minimum level of funding for schools." (*County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1289.) "Proposition 98 [did] not appropriate funds," but instead provided new "formulas for determining the minimum to be appropriated [to schools] every budget year." (*Id.* at p. 1290.)

According to the DOF, for the fiscal years from 2010 to 2015, the minimum guarantee for funding under Proposition 98 was greater than $40 billion each year, and the state contributed over $30 billion each year "in state General Fund monies . . . [and the] state's contribution to schools equates to approximately 40 percent of the state's General Fund revenues each year." In discovery responses, the DOF indicated over $20 billion was available each fiscal year between 2010 and 2014 as "[p]otentially offsetting revenues" for the GR Mandate.

In a 2010 report, the Legislative Analyst's Office indicated that virtually every aspect of the education mandates system was "broken." In 2013–2014, the Legislature adopted the mandate block grant system as an alternative to the traditional mandate reimbursement system. "A school district or county office of education that receives block grant funding . . . shall not be eligible to submit claims to the Controller for reimbursement pursuant to Section 17560 for any costs of any state mandates . . . incurred in the same fiscal year during which the school district or county office of education received funding pursuant to this section." (§ 17581.6, subd. (c)(3).) In 2013, the GR Mandate became part of the mandate block grant system. (§ 17581.6, subd. (f)(23).)

A 2014 Legislative Analyst's Office Report provides that "[b]lock grant funding is allocated to participating [local education agencies] on a per-student basis, as measured by average daily attendance (ADA) for schools." It states that "[a] sizeable majority of [local education agencies] have chosen to participate in the block grants rather than access funding through the traditional claims process. . . . This includes 84 percent of school districts [and] 79% of [county offices of education] . . . ." Therefore, according to the State, "for the vast majority of school districts, the offsets at issue in this case are no

10

longer a live controversy going forward." CSBA and the School Districts allege the block grant system "funds only a portion of the mandate debt that the Commission has determined to be reimbursable." Nonetheless, San Diego Unified School District, Butte County Office of Education, and San Joaquin County Office of Education are alleged to have opted into the block grant funding scheme. Castro Valley Unified School District has not.

> ### F. The Proceedings Below

With this statutory scheme in mind, we next recount this case's procedural history, focusing on the allegations, the request for bifurcation, and the court's ruling on the motion for a writ of mandate as to the second cause of action.

> #### a. The Petition for a Writ of Mandate

On January 6, 2011, CSBA and the School Districts petitioned the Alameda County Superior Court for a writ of mandate, as well as seeking injunctive and declaratory relief. The petition was amended a number of times. The third amended petition, filed February 3, 2014, identified the California School Boards Association as a non-profit corporation and "member-driven association composed of the governing boards of nearly 1,000 K-12 school districts and county boards of education throughout California." The Education Legal Alliance "is composed of over 700 CSBA members dedicated to addressing legal issues of statewide concern to school districts."

The third amended petition alleged Senate Bill No. 856 (adopting Government Code section 17557, subd. (d)(2)(B)) and Assembly Bill No. 1610 (adopting Education Code sections 42238.24 and 56523, subd. (f)) "implemented . . . broad changes in mandate law that were intended to eliminate or reduce the State's mandate reimbursement obligations." CSBA and the School Districts alleged these changes shifted the cost of the BIP Mandate, "approximately $65 million per year, to districts and county offices of education" because "existing funding for other aspects of the special education program is simply required to also be used to reimburse for the costs of [the BIP Mandate]." Similarly, with respect to the GR Mandate, which is alleged to cost over

11

$250 million annually, Education Code section 42238.24 identifies "existing funding and call[s] it 'offsetting revenues' in an attempt to avoid mandate payments."

Based on these allegations, the third amended petition asserted four causes of action. First, CSBA and the School Districts sought "a declaration of whether Education Code sections 42238.24 and 56523 violate article XIII B, section 6 or article III, section 3" of the California Constitution. Second, CSBA and the School Districts sought a declaration that "Government Code section 17557(d)(2)(B) impermissibly burdens the constitutional right to reimbursement guaranteed by article XIII B, section 6 and is invalid to the extent it allows the State to reduce or eliminate mandate claims by claiming 'offsetting revenues' that do not represent new or additional funding . . . as reflected in the Legislature's directives in Education Code sections [42238.24] and 56523." The second cause of action also sought injunctive relief and a writ of mandate to enjoin the Commission, the Director of Finance and/or the State Controller "from construing Government Code [section] 17557(d)(2)(B) to permit the actions directed by Education Code sections 42238.24 and 56523."

Third, CSBA and the School Districts sought declaratory relief, injunctive relief, and a writ of mandate regarding Government Code sections 17570 and 17556. The petition alleged these code sections are unconstitutional because they allow "the Commission to set aside final test claim decisions and issue new test claim determinations based on any 'change in mandate law.' " Fourth, CSBA and the School Districts sought declaratory relief, a prohibitory injunction, and a writ of mandate to declare the "current statutory scheme" contained in Government Code sections 17500 to 17617, "as amended over the past decade" in violation of article XIII B, section 6 of the California Constitution. According to CSBA and the School Districts, these provisions "taken as a whole and as applied to school districts and county offices of education, fail to provide an efficacious remedy and/or constitute an undue restriction on the right to reimbursement under article XIII B, section 6 of the California Constitution."

12

### b. Bifurcation of the "Offsetting Revenue" Issue

CSBA and the School Districts filed a motion to bifurcate, arguing the court should first address the " 'offsetting revenues' " issue central to their first and second causes of action. The court granted the motion to bifurcate the claim for writ of mandate in the second cause of action and to proceed on that claim first.[7] The court found "the economy and efficiency of handling the litigation would be promoted by [the] proposal to litigate the mandate claim in the Second Cause of Action by a noticed motion for writ of mandate rather than trial."

### c. The Court Denies the Motion for Writ of Mandate as to the Second Cause of Action

CSBA and the School Districts subsequently filed a motion "for Writ of Mandate as to the second cause of action, i.e., asking the Court to invalidate Government Code section 17557(d)(2)(B) facially, or as applied in Education Code sections 42238.24 and 56523 . . . ." CSBA and the School Districts argued these statutes were "contrary" to article XIII B, section 6 of the California Constitution. Although only the first cause of action alleged these two Education Code provisions violated the separation of powers doctrine, the motion for writ of mandate also made this argument. After the motion was fully briefed, which included presenting evidence by way of declarations and requests for judicial notice, the court issued a tentative ruling denying the motion, held a hearing on it, and took the matter under submission.

The court denied the motion for a writ of mandate, determining "the State can constitutionally designate certain revenues as offsetting revenues that will reduce or eliminate the State's obligation." Regarding the "as applied" constitutional challenge to Government Code section 17557, subdivision (d)(2)(B), the court stated it was

---

[7] We do not agree with the State that the court's failure to mention the first cause of action in its order was "a clerical error." CSBA and the School Districts sought a writ of mandate in their second cause of action; they did not do so in their first cause of action. Therefore, in addressing the request to proceed first by way of a motion for writ of mandate, the court granted the motion as to the second cause of action.

13

"sympathetic to Petitioners' contention that the Legislature's intent is to satisfy its BIP Mandate and GR Mandate by shifting funds intended to meet other educational needs to those mandates, with the result that the funds provided for those other educational needs are no longer adequate. Nevertheless, the State's plenary power over school financing, and the case law upholding the State's right to allocate funds for specific educational needs, precludes the court from issuing an order that would, in essence, require the State to provide additional funding to school districts to allow them to meet those other educational needs."

The court also rejected the argument the 2010 legislation violates separation of powers principles. The court found the legislation "is not an attempt to override specific rulings by the Commission," [and] "the Legislature did not specifically seek to collaterally attack any particular order of the Commission." The court concluded that even assuming the Legislature sought to obtain a different result in future rulings of the Commission, "that goal is not the basis for a claim that the Legislature usurped the quasi-judicial powers of the Commission."

## DISCUSSION

On appeal, CSBA and the School Districts make four arguments. First, they argue section 17557, subdivision (d)(2)(B), is "contrary" to article XIII B, section 6, of the California Constitution as applied in two Education Code provisions. Second, they contend these statutes violate article III, section 3, of the California Constitution. Third, they argue the court abused its discretion when it denied their motion for leave to amend. Fourth, they argue the court erred when it dismissed their remaining claims. We are not persuaded by the first two arguments, but agree with CSBA and the School Districts that the court should have granted leave to amend, and should not have dismissed the remaining claims.

14

*Section 17557, Subdivision (d)(2)(B), as Applied, Does Not Violate Article XIII B,
Section 6, of the California Constitution*

The California Constitution requires the State to provide "a subvention of funds to reimburse" local governments for the costs of mandated programs or increased levels of service. (Cal. Const., art. XIII B, § 6.) CSBA and the School Districts contend that section 17557, subdivision (d)(2)(B), as applied in two Education Code sections, "allows the State to identify 'offsetting revenues' that will reduce or eliminate its mandate debt even if no new or additional funds are actually provided." We conclude these statutes do not conflict with the constitutional requirement.

A.      Section 17557, Subdivision (d)(2)(B), as Applied in Education Code
        Section 42238.24, Does Not Violate Article XIII B, Section 6

The State may request the Commission to amend the parameters and guidelines for reimbursement of mandated costs to "[u]pdate offsetting revenues and offsetting savings that apply to the mandated program . . . ." (§ 17557, subd. (d)(2)(B).) Some offsetting revenues for the GR Mandate are identified in Education Code section 42238.24, which provides, in part, that "[c]osts related to the salaries and benefits of teachers incurred by a school district or county office of education to provide the courses [required by the GR Mandate] shall be offset by the amount of state funding apportioned to the district . . . or . . . county office of education . . . . The proportion of the school district's current expense of education that is required to be expended for payment of the salaries of classroom teachers . . . shall first be allocated to fund the teacher salary costs incurred to provide the courses required by the state." (Ed. Code, § 42238.24.)

CSBA and the School Districts argue section 17557, subdivision (d)(2)(B), is unconstitutional as applied because if the State can identify as " 'offsetting revenues' " money it already provides to school districts and local offices of education, then article XIII B, section 6 "would be rendered meaningless for education agencies." CSBA and the School Districts rely primarily on the Commission's 2008 determination that a similar attempt by the State to offset the costs of the GR Mandate violated article XIII B, section 6.

15

In 2008, the Commission amended the parameters and guidelines for reimbursement of the GR Mandate, finding in part that "the revenue limit apportionments made to school districts are the districts' 'proceeds of taxes' and cannot be considered offsetting revenue under article XIII B, section 6 of the California Constitution." The Commission reviewed the history and purpose of article XIII B, section 6, concluding "the amount spent by the district on teacher salaries cannot be considered offsetting revenue for purposes of [the GR Mandate]. Such an interpretation would require school districts to use their proceeds of taxes on a state-mandated program. This violates the purpose of article XIII B, section 6 [which] was specifically designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues and restrict local spending in other areas."

CSBA and the School Districts argue a similar analysis applies to section 17557, subdivision (d)(2)(B), as applied in Education Code section 42238.24, because if the State can request the Commission to amend the parameters and guidelines for reimbursement of the GR Mandate to identify state funding as "offsetting revenue", then these statutes "require[] education agencies to divert spending away from their own programs and priorities in order to pay for the State's mandates – contrary to article XIIIB, section 6."

We are not persuaded this argument demonstrates the unconstitutionality of Education Code section 42238.24 because CSBA and the School Districts have not established the statute requires them to use local revenues to pay for the costs of the GR Mandate. Education Code section 42238.24 specifically directs local school districts and county offices of education to use "state funding" as an offset, not local tax revenues. (Ed. Code § 42238.24.) This directive is not incompatible with the State's constitutional obligation to reimburse local governments for state-mandated costs. (*Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 876 ["A state requirement that an entity redirect resources is . . . not a reimbursable mandate"].)

This case is similar to *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, where school districts sought reimbursement for the costs of

16

complying with statutory notice and agenda requirements for meetings of school councils and advisory committees.  (*Id.* at p. 730–731.)  The California Supreme Court concluded "the costs necessarily incurred in complying with the notice and agenda requirements under that funded program do not entitle claimants to obtain reimbursement under article XIII B, section 6, because the state, in providing program funds to claimants, already has provided funds that may be used to cover the necessary notice and agenda-related expenses."  (*Id.* at pp. 746–747.)

Similarly here, the state already provides funding to school districts and county offices of education.  Indeed, it provides tens of billions of dollars in state funding for education each year.  The cost of the GR Mandate is estimated to be over $250 million per year.  Article XIII B, section 6, of the California Constitution "was designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues."  (*County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487 (*Fresno*).)  Where school districts and county offices of education receive tens of billions of dollars in state funding each year, it simply does not follow that they are or were required to use local revenues to pay for teacher salaries and benefits associated with the GR Mandate.

In arguing otherwise, CSBA and the School Districts contend "the Commission and the courts have long considered general education funding 'local revenues' or local 'proceeds of taxes.' "  They also argue that "unrestricted" funds the State provides to school districts must be considered local proceeds of taxes for purposes of article XIII B. In making these contentions, CSBA and the School Districts rely on Government Code section 7906, which provides that, for school districts, " 'proceeds of taxes' shall be deemed to include subventions received from the state" under specified circumstances. (§ 7906, subds. (c), (e).)  But even if a school district's " 'proceeds of taxes' " include state funding, it does not follow, as CSBA and the School Districts contend, that state funding for education should be considered *local* proceeds of taxes.

CSBA and the School Districts also rely on *CSBA II*, where the court determined that "[u]nder article XIII B, section 6, if the State wants to require the local school

17

districts to provide new programs or services, it is free to do so, but not by requiring the local entities to use their own revenues to pay for the programs." (*CSBA II*, *supra*, 192 Cal.App.4th at p. 787.) The court determined the practice of appropriating only $1,000 for mandated programs, with the intention to pay the remainder later, did not comply with the State's constitutional and statutory obligations to fund the mandates. (*Id.* at p. 785.)

Here, we face a different question: whether it is constitutional for the Legislature to consider funds it already provides school districts and county offices of education as "offsetting revenue." (§ 17557, subd. (d)(2)(B); Ed. Code, § 42238.24.) By doing so, the Legislature does not require "the local entities to use their own revenues to pay for the programs." (*CSBA II*, *supra*, 192 Cal.App.4th at p. 787.) Hence, there is no conflict with the constitutional obligation to reimburse for mandated programs. (*Fresno*, *supra*, 53 Cal.3d at p. 487 [article XIII B, section 6 protects "the tax revenues of local governments from state mandates"].)

CSBA and the School Districts contend that section 17557, subdivision (d)(2)(B) is susceptible to a "broad" and "narrow" construction, and that only the narrow one, which incorporates the "limiting language" of section 17556, subdivision (e), is constitutional. Section 17556, subdivision (e) provides the Commission shall not find a reimbursable mandate if the statute includes "additional revenue that was specifically intended to fund the costs of the state mandate . . . ." Because section 17557, subdivision (d)(2)(B) incorporates this "limiting language," CSBA and the School Districts contend it must be interpreted to mean " 'offsetting revenues' " are " 'specifically intended' " to fund the mandate.

We disagree. In construing a statute, our task is to determine the Legislature's intent and purpose for the enactment. (*People v. Tindall* (2000) 24 Cal.4th 767, 772 (*Tindall*).) We look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning. (*Ibid.*) If there is no ambiguity in the statutory language, its plain meaning controls; we presume the Legislature meant what it said. (*Ibid.*)

18

Here, section 17557, subdivision (d)(2)(B) addresses amendments to parameters and guidelines for reimbursement of a mandate, and it expressly provides the State can request the Commission to amend parameters and guidelines for reimbursement to "[u]pdate offsetting revenues . . . that apply to the mandated program *and do not require a new legal finding that there are no costs mandated by the state pursuant to subdivision (e) of section 17556*." (§ 17557, subd. (d)(2)(B), italics added.)

This language, by its plain terms, implies the opposite of what CSBA and the School Districts contend it implies. Under their proposed narrow construction, " 'offsetting revenues' " must be "specifically intended" to fund the mandate. But section 17557, subdivision (d)(2)(B) provides that offsetting revenues can be identified that do *not* require a new legal finding of no costs pursuant to subdivision (e) of section 17556, and hence, that were not " 'specifically intended' " to fund the mandate. (§§ 17557, subd. (d)(2)(B), 17556, subd. (e).) We reject the narrow interpretation of these statutes proposed by CSBA and the School Districts because it does not comport with their plain language, and " ' "the Legislature is presumed to have meant what it said." ' " (*Tindall*, *supra*, 24 Cal.4th at p. 772.)

Finally, CSBA and the School Districts argue the State's position would "necessarily" require reimbursement for some school districts but not others because wealthier districts that receive only nominal state funding "would continue to be entitled to receive reimbursement while districts receiving state funding would not." The trial court did not address this argument in part because CSBA and the School Districts presented no evidence to support it. For the same reason, we do not consider it. In any event, this argument does not pertain to the constitutionality of the statutes at issue under article XIII B, section 6.

We acknowledge that by enacting Education Code section 42238.24, the Legislature may have largely eliminated the State's obligation to reimburse school districts and county offices of education for the GR Mandate without actually providing

19

any new or additional funding.[8]  We emphasize that our decision affirming the constitutionality of a particular statute "is not in any sense an endorsement" of it.  (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 962.)  "Courts have nothing to do with the wisdom of laws or regulations . . . .  The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations."  (*Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 461–462.)  Moreover, "there is no basis for applying section 6 as an equitable remedy to cure the perceived unfairness resulting from political decisions on funding priorities."  (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1817.)  Here, given that the State, through its budget acts, provides funding to school districts and county offices of education in amounts it deems sufficient to ensure the local entities do not have to rely on local revenues to pay the costs of the GR Mandate, we discern no conflict with article XIII B, section 6, of the California Constitution.

        B.      Section 17557, Subdivision (d)(2)(B), as Applied in Education Code Section 56523, Subdivision (f), Does Not Violate Article XIII B, Section 6

For similar reasons, section 17557, subdivision (d)(2)(B), as applied in Education Code section 56523, subdivision (f), which concerns the BIP Mandate, does not violate the constitutional obligation to reimburse local governments for mandates.  The statute at issue provides "[c]ommencing with the 2010–11 fiscal year, if any activities authorized pursuant to this chapter and implementing regulations are found be a state reimbursable mandate . . . , state funding provided for purposes of special education [in] the annual Budget Act shall first be used to directly offset any mandated costs."  (Ed. Code, § 56523, subd. (f).)

---

[8]    Based on the materials in the record, it appears that Education Code section 42238.24 will not entirely eliminate the obligation because it focuses on the costs of teacher salaries and benefits.  The parameters and guidelines for reimbursement of the GR Mandate also identify the costs of acquiring additional space, remodeling existing spaces, and supplies, as reimbursable costs.

The Commission addressed this statute in its 2013 statement of decision regarding the parameters and guidelines for reimbursement of the BIP Mandate. The Commission noted the State currently provides over $3 billion in special education funding each year. The Commission concluded that "[w]here the funding at issue is given by the state in the first instance, the Commission must assume that the Legislature acts consistently with the Constitution if the Legislature designates a portion of those non-local funds to cover the costs of a mandated program or activity." (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, p. 57.)

CSBA and the School Districts point out the Commission was "required to presume the constitutionality of section 56523." Administrative agencies, like the Commission, have no power to declare a statute unconstitutional. (Cal. Const., art. III, § 3.5.) We, unlike the Commission, do have this power. (*CSBA II*, *supra*, 192 Cal.App.4th at pp. 785–790 [finding unconstitutional the practice of appropriating a nominal amount for mandated programs].)

Nevertheless, we discern no conflict between the statutes at issue and the California Constitution because they do not require schools to use local revenues to pay for the BIP Mandate. (*Fresno*, *supra*, 53 Cal.3d at p. 487.) The BIP Mandate is estimated to cost $65 million per year, but school districts and county offices of education receive approximately $3 billion in special education funding. Given that special education funding is sufficient to cover the costs of the BIP mandate, then section 17557, subdivision (d)(2)(B), as applied in Education Code section 56523, subdivision (f), does not conflict with article XIII B, section 6 of the California Constitution.

In arguing otherwise, CSBA and the School Districts contend that "special education is already significantly underfunded," and section 56523 provides no actual new funding. But even so, they never explain how these facts establish section 56523, subdivision (f), requires school districts to use "their own local revenues" to pay for the BIP Mandate. By its plain terms, it directs them to use "state funding provided for purposes of special education" to pay for the BIP Mandate, not local revenues. (Ed. Code

21

§ 56523, subd. (f).) Therefore, it does not violate article XIII B, section 6, of the California Constitution.

*Section 17557, Subdivision (d)(2)(B), as Applied, Does Not Violate Separation of Powers Principles*

Next, CSBA and the School Districts contend it violates article III, section 3, of the California Constitution for the Legislature to allow state funding or special education funding to be identified as offsetting revenues for state-mandated programs. We disagree.

A.  Separation of Powers

"The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) "Although . . . article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52.) "Of necessity the judicial department as well as the executive must in most matters yield to the power of statutory enactments." (*Brydonjack v. State Bar of Cal.* (1929) 208 Cal. 439, 442; accord, *Mendocino*, at p. 54.)

In *California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183 (*CSBA I*), the court considered a statute directing the Commission to "set aside" some test claim decisions and "reconsider" others. (*Id.* at p. 1192.) The court concluded the legislation violated the separation of powers doctrine because "[a]s a quasi-judicial decision maker, the Commission does its work independent of legislative oversight and is not subject to review by the Legislature." (*Id.* at p. 1199.) The Commission "has the sole and exclusive authority to adjudicate whether a state mandate exists." (*Id.* at p. 1200.) If dissatisfied with the Commission's decision, the state can file a proceeding pursuant to

Government Code section 17559.  (*Ibid*.)  But once the Commission's decisions are final, and have not been set aside by a court, the Legislature does not have the power to direct the Commission to set them aside or reconsider them.  (*Id*. at pp. 1200–1201.)

B.    Government Code Section 17557, Subdivision (d)(2)(B), as Applied in Education Code Section 42238.24, Does Not Violate Separation of Powers Principles

CSBA and the School Districts contend "the Commission and courts have previously rejected the argument that the State's general funding for the education program can lawfully 'offset' its reimbursement obligations.  The administrative decision and judicial review are both final.  Education Code section 42238.24 is therefore a transparent attempt to overturn these final administrative and judicial decisions . . . ."  This argument relies on the Commission's 1987 decision recognizing the GR mandate, its 1988 decision that staffing for the new science classes was a reimbursable cost, a 2004 Sacramento County Superior Court decision regarding offsetting savings, and the Commission's 2008 adoption of parameters and guidelines for reimbursement of the GR mandate.

We disagree the statutes at issue violate separation of powers principles.  First, this legislation is not an attempt to overturn the Commission's 1987 decision that recognized the existence of the GR Mandate or its 1988 decision that staffing costs are reimbursable.  The question here is not whether the GR Mandate exists or whether staffing costs are reimbursable, but whether it is constitutional for the Legislature to require school districts and county offices of education to rely on "state funding" they already receive to pay for the costs of the GR Mandate.  Second, the legislation does not seek to overturn the Sacramento County Superior Court's 2004 decision, where the court determined that savings attained by laying off teachers for non-mandated courses should not be considered offsetting savings.  That decision did not address offsetting revenues.

Third, and most importantly, there is some tension between the 2010 legislative changes and the Commission's 2008 determination that "revenue limit apportionments made to school districts . . . cannot be considered offsetting revenue under article XIII B,

23

section 6 of the California Constitution." The statutes at issue seek to identify "state funding" as "offsetting revenue" (§ 17557, subd. (d)(2)(B); Ed. Code, § 42238.24), but state funding, up until the 2013–2014 fiscal year, included revenue limit apportionments. The State contends Education Code section 42238.24, which became effective October 19, 2010, applies "prospectively only." According to the State, it does not violate separation of powers principles for the Legislature to "abrogate" the Commission's 2008 decision prospectively. We requested supplemental briefing on whether Education Code section 42238.24 also applies retroactively, to claims for reimbursement of the costs of the GR Mandate preceding the 2010–2011 fiscal year.

Having reviewed the supplemental briefs, we conclude the statute does not apply retroactively. It is within the power of the Legislature to amend statutes to overrule a judicial decision. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473–474 (*McClung*).) It is presumed those changes apply prospectively, not retroactively, because of " 'the unfairness of imposing new burdens on persons after the fact.' " (*Id.* at p. 475) For this reason, a " 'statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.' " (*Ibid.*)

The text of the statutes does not contain express language of retroactivity; instead, Education Code section 42238.24 provides the costs of teacher salaries and benefits "shall be offset" by state funding, and Government Code section 17557, subdivision (d)(2)(B), refers to "updating" offsetting revenues. (§ 17557, subd. (d)(2)(B); Ed. Code, § 42238.24.) In arguing the statutes apply prospectively only, the Commission points to a budget committee analysis of Assembly Bill No. 1610. It provides Education Code section 42238.24 was intended to: "Limit state costs for the High School Science Graduation mandate claim (about $2 billion in past costs and $200 million annually in ongoing costs) by directing [local education agencies] to use state apportionment and flexible categorical funding to cover related costs. Requires districts to first fund teacher salary costs for courses required by the state when determining the proportion of their budgets statutorily required to be expended for the salaries of classroom teachers."

24

(Assem. Com. on Budget, Floor Analyses, Concurrence in Sen. Amends. to Assem. Bill No. 1610 (2009–2010 Reg. Sess.), as amended Oct. 7, 2010, p. 2.)  But this statement cuts both ways in that it refers to limiting both past costs and ongoing costs.

A DOF enrolled bill report is more helpful.[9]  It provides that Education Code section 42238.24 "would require districts and counties to offset *Graduation Requirements* mandate costs first with State-provided funds, which should minimize the State's exposure to hundreds of millions of dollars of new annual costs." (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No.1610 (2009–2010 Reg. Sess.), as amended Oct. 7, 2010, p. 4.)  This reference to minimizing "new annual costs" suggests the statute applies prospectively only.

Moreover, the DOF's discovery responses are consistent with this interpretation.  In response to an interrogatory requesting the DOF to identify all potentially offsetting revenues for the GR Mandate pursuant to Education Code section 42238.24 since 2009, the DOF identified revenues starting in the 2010–2011 fiscal year.  In the absence of " 'a clear and unavoidable implication that the Legislature intended retroactive application,' " we interpret Education Code section 42238.24 to apply to claims for reimbursement of the GR Mandate beginning in the 2010-2011 fiscal year. (*McClung*, *supra*, 34 Cal.4th at pp. 475–477 [holding change to employment law that abrogated California Supreme Court's decision did not apply retroactively to conduct predating its enactment].)

In their supplemental brief, CSBA and the School Districts contend Education Code section 42238.24 "operates retroactively in that it was intended to, and did, 'affect rights, obligations, acts, transactions and conditions which [were] performed or exist[ed] prior to the creation of the statute.' "  This approach conflates the issue of whether a statute impacts antecedent rights and obligations with the issue of whether it operates

---

[9]     An enrolled bill report is prepared by the executive branch for the Governor after a bill has passed both legislative houses and before it has been signed. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 934.)  Although not entitled to great weight, courts consider them "instructive on matters of legislative intent." (*Id.* at p. 934, fn. 19.)

retroactively. "[A] statute that interferes with antecedent rights will not operate retroactively unless such retroactivity be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' " (*McClung*, *supra*, 34 Cal.4th at p. 475.)

Education Code section 42238.24 does interfere with antecedent rights and obligations because, beginning with the 2010–2011 fiscal year, it requires school districts and county offices of education to treat state funding, including revenue limit apportionments, as offsetting revenue when seeking reimbursement for the costs of teacher salaries and benefits under the GR Mandate. (§ 17557, subd. (d)(2); Ed. Code, § 42238.24.) But this change, in and of itself, does not violate the doctrine of separation of powers. It abrogates the Commission's 2008 decision, but "[o]ver time, any particular decision of the Commission may be rendered obsolete by changes in the law and material circumstances that originally justified the Commission's decision." (*CSBA I, supra*, 171 Cal.App.4th at p. 1202.)

What the Legislature cannot do is order the Commission to set aside or reconsider its previous decision. (*CSBA I*, *supra*, 171 Cal.App.4th at pp. 1199–1202.)[10] The Commission's 2008 determination will continue to apply to claims for reimbursement preceding the 2010–2011 fiscal year. As the State observes, the Commission's 2008 determination "continues to apply to costs claimed prior to the enactment of the statute." In other words, for reimbursement claims for the cost of teacher salaries and benefits under the GR Mandate prior to the 2010–2011 fiscal year, revenue limit apportionments

---

[10]     CBSA and the School Districts request we take judicial notice of the Sacramento County Superior Court's 2007 judgment in *California School Boards Association, et al. v. State of California, et al.* (Super. Ct. Sacramento County, 2009, No. 06CS01335). We deny this request. Generally, we do not take judicial notice of superior court judgments because they have no precedential value. (*Pereira-Goodman v. Anderson* (1997) 54 Cal.App.4th 864, 872, fn. 5.) Moreover, the aspect of the superior court's decision to which CSBA and the School Districts seek to draw our attention is discussed in *CSBA I*, *supra*, 171 Cal.App.4th at p. 1199, so there is no need for us to take judicial notice of the superior court's decision.

26

cannot be considered offsetting revenue. As so construed, this exercise of legislative power does not impermissibly encroach on the powers of the Commission, or otherwise violate article III, section 3, of the California Constitution.

C.      Section 17557, Subdivision (d)(2)(B), as Applied in Education Code Section 56523, Subdivision (f), Does Not Violate Separation of Powers Principles

With regard to the BIP Mandate, the legislation at issue provides "[c]ommencing with the 2010–11 fiscal year, if any activities authorized pursuant to this chapter and implementing regulations are found be a state reimbursable mandate pursuant to Section 6 of Article XIII B of the California Constitution, state funding provided for purposes of special education [in] the annual Budget Act shall first be used to directly offset any mandated costs." (Ed. Code § 56523, subd. (f).) According to the CSBA and the School Districts, this statute, when used in conjunction with Government Code section 17557, subdivision (d)(2)(B), violates article III, section 3, of the Constitution because it was intended to negate or nullify the Commission's 2000 decision establishing the BIP Mandate.

We disagree. First, these legislative changes do not question whether the BIP Mandate exists; instead, they update the parameters and guidelines for reimbursement of the BIP Mandate. (§ 17557, subd. (d)(2)(B); Ed. Code, § 56523, subd. (f).) As CSBA and the School Districts themselves acknowledge, "[t]he issue in this case is not whether . . . mandates exist – clearly, they do – it is about what constitutes payment or reimbursement for the mandate." Second, by its express terms, Education Code section 56523, subdivision (f), applies to reimbursement claims "[c]ommencing with the 2010– 11 fiscal year." Because it applies prospectively only, it does not seek to set aside a prior, final decision of the Commission and therefore does not encroach on the powers of the Commission. (*CSBA I*, *supra*, 171 Cal.App.4th at pp. 1199–1201.)

CSBA and the School Districts contend the Commission's 2000 determination establishing the BIP Mandate "concluded that special education funding did not defeat the mandate because such funding was not intended for the BIP Mandate." They point to

27

the Commission's 2013 decision adopting parameters and guidelines for reimbursement of the BIP Mandate, wherein the Commission stated that Assembly Bill 1610 is intended "to negate the Commission's decision on reimbursement for this program," and they point out the Commission's decision establishing the BIP Mandate is "final and the subsequent judicial review proceeding was dismissed by the State."

However, in the Commission's 2013 decision, the Commission found that appropriations in the state budget for special education "are potentially offsetting from July 1, 1993 until October 19, 2010, and must be deducted from a reimbursement claim to the extent a district applied these funds to provide for BIPs mandated activities." (Commission on State Mandates, Decision No. CSM-4464, adopted Apr. 19, 2013, p. 50.) The Commission also concluded the 2010 changes to Education Code section 56523 "transform potential offsets to required offsets, beginning in fiscal year 2010–2011." (*Id.* at p. 55.) For the Commission, then, amending the parameters and guidelines for reimbursement of the BIP Mandate in the ways required by Education Code, section 56523, subdivision (f), was not incompatible with its decision in 2000, establishing the BIP Mandate. Section 17557, subdivision (d)(2)(B), as applied in Education Code, section 56523, subdivision (f), does not violate the separation of powers doctrine.

### III.

### *The Court Abused Its Discretion by Denying Leave to Amend*

CSBA and the School Districts argue the court abused its discretion when it denied their motion for leave to amend their third amended petition. We begin with a review of the procedural history associated with the request for leave to amend.

### A. Request for Leave to Amend

When the motion for a writ of mandate was under submission, CSBA and the School Districts moved "to amend to conform to proof or correct an imperfection in pleading." They sought to amend their petition "to clarify that (1) the original reference to 'revenue limit funding' should currently be to the 'local control funding formula' and [education protection account] funding, and (2) although [education protection account]

28

funding is a component of LCFF, it has a separate constitutional basis and is governed by separate constitutional provisions." About three weeks after the court issued its July 6, 2015 ruling denying their motion for a writ of mandate, CSBA and the School Districts filed a supplemental brief in support of their motion to amend, arguing the purpose of the amendments was to address an argument not covered by the court's ruling, namely, whether using education protection account funds, pursuant to Education Code section 42238.24, to pay for the costs of the GR Mandate would violate article XIII, section 36, of the California Constitution.

The court denied leave to amend, finding the proposed amendments did not merely seek to conform the pleadings to proof, but instead sought to add a new legal theory to the first cause of action. The court found the delay in presenting the new theory was inexcusable because education protection account funding commenced in 2013. The court also determined the State would be prejudiced by the "additional expense created by a new round of briefing that could and should have been avoided."

In response to requests for clarification, the court's order stated its "ruling on the Writ of Mandate, which was necessarily limited by the motion itself to the Second Cause of Action, has resolved the issues raised by the First Cause of Action for Declaratory Relief." The court indicated it "has ruled that the State can constitutionally designate certain revenues as offsetting revenues that will reduce or eliminate the State's reimbursement obligation. Petitioners conceded that this was the issue raised in the First and Second Causes of Action, and cannot now disclaim that the First Cause has been resolved."

> B.  The Court Abused Its Discretion by Denying Leave to Amend to Add a New Legal Theory

Trial courts are vested with the discretion to allow amendments to pleadings "in furtherance of justice." (Code Civ. Proc., §§ 473, subd. (a)(1), 576.) Trial courts should liberally permit such amendments. (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19; *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 760 (*Atkinson*); *Hirsa v. Superior Court* (1981) 118 Cal.App.3d 486, 488–489 (*Hirsa*).) If the proposed amendment will

29

not prejudice the adverse party, it may be an abuse of discretion to deny leave to amend. (*Atkinson*, *supra*, 109 Cal.App.4th at p. 761.)  Nonetheless, a trial court may deny leave to amend when there is unwarranted delay in seeking it.  (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 (*Reason*); *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486–487 (*Magpali*).)

Here, we conclude the court abused its discretion by denying leave to amend to add an additional legal theory.  The court identified the "additional expense created by a new round of briefing" as prejudicial to the State, but we cannot agree this cost was unduly prejudicial.  First, at the time of the request for leave to amend, there were still other causes of action pending against the State, so the parties anticipated further briefing with or without the amendment.  Second, it is "irrelevant that new legal theories are introduced as long as the proposed amendments 'relate to the same general set of facts.' " (*Kittredge Sports Co. v. Superior Court* (1989) 213 Cal.App.3d 1045, 1048.)  Here, CSBA and the School Districts sought to allege that if the State considered education protection account funding an offset under Education Code section 42238.24, then the statute would violate article III, section 36 of the California Constitution, which provides that county offices of education and school districts "shall have sole authority to determine how the moneys received from the Education Protection Account are spent . . . ."  (Cal. Const., art. XIII, § 36, subd. (e)(6).)  This proposed amendment relates to the same statutory scheme already under consideration, so the court should not have denied leave to include it.

Third, "[a]s a general rule, where the evidence to support the cause of action in the amendment is already before the court, the opposing party will not experience prejudice if the amendment is allowed."  (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1618.)  The State does not contend the proposed amendment would have required additional discovery or evidence.  The costs of additional briefing did not justify denying leave to amend.

Nor can we agree the delay in seeking leave to amend was inexcusable.  Even though CSBA and the School Districts sought leave to amend "four years into the case,"

30

the request was based on the State's response to an interrogatory served in February 2015, only three months before the motion for leave to amend. In that interrogatory response, the State indicated that "education protection account revenues are potentially offsetting" for the GR Mandate. In denying leave to amend, the court stated CSBA and the School District knew about education protection account funding when they filed their third amended petition in February 2014, and they should have made allegations regarding education protection account funding in the third amended petition, or raised the argument associated with this funding in the motion for a writ of mandate. But the State did not indicate until its February 2015 discovery response that it considered education protection account revenues potentially offsetting for the GR Mandate; therefore, there was no reason for CSBA and the School Districts to include allegations regarding these revenues in their third amended petition.

In defending the court's decision, the State relies on *Reason, supra,* 73 Cal.App.4th 472, but the case is distinguishable. In *Reason*, the court denied leave to amend where the appellant "had knowledge of the circumstances on which he based the amended complaint on the day he was injured . . . ." (*Id*. at pp. 486–487.) But here, the request for leave to amend was not based on events known when the case commenced or when the third amended petition was filed; instead, it was based on the State's indication in its February 2015 discovery responses that it considered education protection account funding as potentially offsetting.

It is true that CSBA and the School Districts could have raised this issue in their motion for a writ of mandate, filed three weeks after the State's discovery responses. Nevertheless, their failure to do so was not so inexcusable as to overcome the liberal policy permitting amendments to pleadings. (*Atkinson*, *supra*, 109 Cal.App.4th at p. 760; *Hirsa, supra,* 118 Cal.App.3d at pp. 488–489.) This new theory did not undermine the court's ruling that the statutes at issue do not violate article XIII B, section 6, or article III, section 3, of the Constitution. The proposed amendment did not threaten to radically alter the nature of the allegations. (*Magpali*, *supra*, 48 Cal.App.4th at p. 487 [denying leave to amend in part because "adding the new cause of action would have changed the

31

tenor and complexity of the complaint."].)  Given that the court had yet to address legal questions raised by the third and fourth causes of action, denial of leave to amend to add a new legal theory was an abuse of discretion.

We emphasize that, by remanding this matter to permit leave to amend, CSBA and the School Districts are not permitted to reargue whether section 17557, subdivision (d)(2)(B), as applied in Education Code section 42238.24 and section 56523, subdivision (f), violates article XIII B, section 6, or article III, section 3, of the California Constitution.  As part of its order denying the motion for a writ of mandate, the court also determined CSBA and the School Districts are not entitled to a declaration these two Education Code sections violate article XIII B, section 6, or the doctrine of separation of powers, as alleged in the first cause of action.  We remand for leave to amend to add one other legal theory to the first cause of action; namely, whether it violates article III, section 36, of the California Constitution for the State to consider education protection account funds as offsetting state funding under Education Code section 42238.24.

IV.

*The Court Erred by Dismissing the Third and Fourth Causes of Action*

On January 7, 2016, five years and one day after this lawsuit commenced, the State moved to dismiss it, arguing CSBA and the School Districts failed to bring the third and fourth causes of action in the third amended petition to trial within five years.  "An action shall be brought to trial within five years after the action is commenced against the defendant." (Code Civ. Proc., § 583.310.)  Relying primarily on *Sagi Plumbing v. Chartered Construction Corp.* (2004) 123 Cal.App.4th 443 (*Sagi Plumbing*), the court determined that the hearing on the second cause of action was "not the start of a trial that would have disposed of the entire case."  The court found "the issues presented in the First and Second cause of action are not precursors to the . . . issues raised in the Third and Fourth Causes of Action, but rather are separate and distinct claims."  Therefore, the court granted the motion to dismiss.

32

The court's reliance on *Sagi Plumbing* was misplaced. In that case, a plumbing contractor sued its general contractor for breach of contract based on the general contractor's failure to pay "on three unrelated projects." (*Sagi Plumbing*, *supra*, 123 Cal.App.4th at p. 445.) On one of them, the Hollywood Bowl project, other subcontractors also sued the general contractor, and their cases were consolidated with that of Sagi Plumbing. (*Ibid.*) The parties stipulated to bifurcate the consolidated action from Sagi Plumbing's two remaining claims arising out of the Inglewood High School and Torrance High School projects. (*Id.* at pp. 445–446.) After a trial in the consolidated action, the parties agreed to sever Sagi Plumbing's second and third claims to allow a judgment to be entered in the consolidated action. (*Id.* at p. 446.)

The trial court subsequently granted a motion to dismiss the second and third causes of action based on the failure to bring them to trial within five years. (*Sagi Plumbing*, *supra*, 123 Cal.App.4th at p. 447.) The court of appeal affirmed, concluding that "none of the issues determined in the Hollywood Bowl action related to any of the issues to be tried in the causes of action based upon the Inglewood and Torrance High School projects. Resolution of the Hollywood Bowl action did nothing to resolve any of the issues in those two causes of action. Consequently, we reject appellant's argument that the trial of the Hollywood Bowl action constituted a partial trial of the remaining two causes of action." (*Id.* at p. 449.)

We are not persuaded a similar analysis applies here. CSBA and the School Districts' third cause of action alleged that amendments to Government Code section 17570 violate article XIII B, section 6, and article III, section 3, of the California Constitution because they allow "the Commission to set aside final test claim decisions and issue new test claim determinations based on any 'change in mandate law.' " It was alleged Education Code sections 42238.24 and 56523 constituted " 'changes in mandate law' " that could be used to institute new test claims regarding the GR Mandate and the BIP Mandate in violation of the Constitution. Therefore, the third cause of action asserted the same type of constitutional challenge the court already addressed, and it referred to the same two Education Code provisions. While the court's analysis

33

regarding the second cause of action does not resolve the issues raised in the third cause of action, the court's prior analysis would surely have helped in their resolution. Moreover, in addressing the motion for a writ of mandate on the second cause of action, the court was required to master the complex statutory scheme associated with reimbursement of education mandates, and, by doing so, the court laid the groundwork to tackle the legal issues raised by the third cause of action.

The same is true regarding the fourth cause of action. CSBA and the School Districts alleged "the provisions of Government Code sections 17500 – 17617, as amended over the past decade" violate article XIII B, section 6. This allegation appears to encompass the issues already decided by the court, and adds the specific questions of whether "the limited remedy afforded by Government Code section 17612(c) fails to adequately protect the interests of school districts and county offices of education," and whether it is constitutional to require school districts opting into the block grant system to waive their right to complete reimbursement. These questions concern the same statutory scheme for reimbursement of education mandates. As such, they are related to the questions previously decided, and this cause of action should not have been dismissed.

In arguing otherwise, the State contends the hearing on the writ of mandate does not establish the case was brought to trial within five years because the hearing "was not designed to dispose of *the entire case*." The State relies on *Berri v. Superior Court* (1955) 43 Cal.2d 856 (*Berri*), where the California Supreme Court stated "[t]he essential thing is that the action be brought to a stage where final disposition is to be made of it." (*Id.* at p. 859–860.) *Berri* is inapposite because claims were not bifurcated in that case; instead the California Supreme Court considered whether the trial court should have entered a judgment of dismissal after sustaining a demurrer without leave to amend. (*Id.* at p. 858.)

In bifurcated cases, the remaining issues should be deemed " 'brought to trial' " if the court has decided contested issues "pertinent to resolving the outstanding issues." (*Sagi Plumbing*, *supra*, 123 Cal.App.4th at pp. 447, 448.) In *In re Marriage of Macfarlane & Lang* (1992) 8 Cal.App.4th 247, the court held it was error to dismiss a

bifurcated marriage dissolution proceeding under the five-year statute where, in the first stage of the proceeding, the court granted a judgment of dissolution after a contested hearing, and where, at the second stage of the proceeding, the court had decided some, but not all, contested property claims. (*Id.* at pp. 250–251, 254–255.)

Here, CSBA and the School Districts commenced this action in January 2011, and they filed their third amended petition in February 2014. In November 2014, the court granted a motion to bifurcate, and CSBA and the School Districts filed their motion for a writ of mandate in March 2015. The court held a contested hearing on the motion in May 2015, and in July 2015, the court ruled on questions raised by the first and second causes of action in the third amended petition. This ruling addressed questions pertinent to resolving the remaining issues raised by the third and fourth causes of action. Thus, it was sufficient to show the action had been " 'brought to trial' " for purposes of the five-year statute.

In defending the court's dismissal of the third and fourth causes of action, the State relies on *Lakkees v. Superior Court* (1990) 222 Cal.App.3d 531 (*Lakkees*). The case is distinguishable. In *Lakkes*, which concerned a bifurcated dissolution proceeding, the court affirmed denial of a motion to dismiss because the five-year statute was "tolled during the period in which a child support order [was] in effect." (*Id.* at p. 534.) In dicta not relevant to its holding, the court stated the hearing on marriage dissolution in the first bifurcated part of the case did not constitute a " 'partial trial' " because the ex-husband did not contest the dissolution, and the dissolution hearing did not bring the case to a stage where final disposition of it could be made. (*Id.* at pp. 536–538.) But, depending on the outcome of the first part of a bifurcated case, it may or may not finally dispose of the whole case. By bifurcating a case, the court hopes to resolve a "pivotal issue" or "simplify" the remaining issues. (*In re Marriage of Macfarlane & Lang*, *supra*, 8 Cal.App.4th at p. 257.) Where, as here, there was a contested hearing on issues whose resolution would have simplified or aided the court's resolution of the remaining issues, then this action was "brought to trial within five years." (Code Civ. Proc., § 583.310.)

Courts have defined when an action is " 'brought to trial' " in a variety of ways for purposes of the five-year statute. (*In re Marriage of Macfarlane & Lang*, *supra*, 8 Cal.App.4th at p. 254.) " 'A "trial" is the examination before a competent tribunal, according to the law of the land, of questions of fact or of law put in issue by pleadings, for the purpose of determining the rights of the parties.' " (*Ibid.*) A trial involves "the determination of an issue of law or fact." (*Berri*, *supra*, 43 Cal.2d at p. 859.) " 'A trial is generally considered an adversary proceeding for the determination of a contested issue arising out of pleadings in which a fact or conclusion of law is maintained by one party and controverted by the other.' " (*Lakkees*, *supra*, 222 Cal.App.3d at p. 536.) Under these definitions, this action was brought to trial as a result of the hearing on the motion for a writ of mandate: the hearing was contested, and it resolved issues of law put in issue by the pleadings for the purpose of determining the constitutional and statutory rights of the parties.

Finally, the State argues public policy considerations support dismissal of this case. The State argues it would have harmed all parties if the court's 2015 hearing on the motion for writ of mandate "reset the clock" on the need to bring the third and fourth causes of action to trial. We give little weight to this concern in a case alleging the State has delayed reimbursing the costs of education mandates for decades.

## DISPOSITION

The judgment is affirmed in part and reversed in part. We hold Government Code section 17557, subdivision (d)(2)(B), as applied in Education Code sections 42238.24 and 56523, subdivision (f), does not violate article XIII B, section 6, or article III, section 3, of the California Constitution. However, we reverse the court's rulings on the motion for leave to amend and the motion to dismiss. We remand this case to the Alameda County Superior Court to allow CSBA and the School Districts to amend the first cause of action to allege that identifying education protection account funding as an offset under Education Code section 42238.24 violates article III, section 36, of the California Constitution. We also reverse the court's dismissal of the third and fourth causes of

action.  Each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

_____

Jones, P. J.

We concur:


_____

Simons, J.


_____

Needham, J.


A148606

38

California School Boards Association, et al. v. State of California, et al. (A148606)


Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Evelio Grillo

Counsel:

Olson Hagel & Fishburn, Deborah B. Caplan and Richard C. Miadich, for Plaintiffs and Appellants California School Boards Association and its Education Legal Alliance.

Xavier Becerra, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Constance L. LeLouis, Supervising Deputy Attorney General and Seth E. Goldstein, Deputy Attorney General, for Defendants and Respondents State of California, State Controller John Chiang, and Director of the Department of Finance Michael Cohen.

Camille Shelton, Chief Legal Counsel, for Defendant and Respondent Commission on State Mandates.

A148606